LONDON, The (KIEF v.). See Case No. 7,759.

LONDON (LANNING v.). See Cases Nos. 8,074–8,076.

LONDON & L. INS. CO. (BAYLY v.). See Case No. 1,145.

---

## Case No. 8,474.
### The LONDON PACKET.
[1 Mason, 14.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1815.[2]

PRIZE—PROOF OF REGULARITY OF CAPTURE—PROPERTY SHIPPED IN HOSTILE VESSEL — PRESUMPTION — RIGHT OF CONSUL TO CLAIM—NEW EVIDENCE AFTER APPEAL.

1. Where the captors have been guilty of irregularity, in not bringing in the papers, or the master of the captured ship, farther proof will be ordered.

2. Where property is shipped in an enemy's vessel, the presumption of its being enemies' property can only be repelled by strong and clear proofs of a neutral interest.
[Cited in U. S. v. One Hundred Barrels Cement, Case No. 15,945.]

3. Circumstances leading to condemnation.

4. The consul of a nation may claim on behalf of its subjects, in the absence of any authorized agent.
[Cited in Harrison v. Vose, 9 How (50 U. S.) 382; The Conserva, 38 Fed. 434.]

---

[1] [Reported by William P. Mason, Esq.]
[2] [Reversed in 5 Wheat. (18 U. S.) 132.]

5. After an appeal, the court may allow evidence, not received in season to be made a part of the case. to be put upon the record de bene esse, with a memorandum of the fact.

[Appeal from the district court of the United States for the district of Massachusetts.]

This was a claim for a parcel of hides, shipped, as appeared by the bill of lading, on the 19th of June, 1813, at Buenos Ayres, on board of a British ship [the London Packet, Smith, master] bound to London, for account and risk of D. J. Marino, a Spanish subject, and captured by the private armed brig Argus, in August, 1813. In the district court, farther proof was ordered for the claimants [unreported], but before sufficient time had elapsed for procuring it, the captors pressing for a decision on the evidence before the court, and that being deemed insufficient to authorize condemnation, the property was restored. The captors appealed to this court, where the cause was first heard at the October term, 1814. From the evidence produced by the captors, it appeared that preparation for resistance was made on board of the British ship; but, upon being informed that the summoning ship was the United States brig Argus, the British commander surrendered to a supposed superior force.

Mr. Blake, Dist. Atty., for captors.

1. If resistance was not actually made, it was intended and prepared for. The mistake of the British commander alone prevented a battle. But it is not necessary for the captors to prove an actual resistance. The mere lading of goods by a neutral on board of an armed ship of the enemy is such an association for resistance, as will subject them to forfeiture. A much less co-operation is sufficient for this purpose. No distinction is to be made between public armed ships and letters of marque. They are equally commissioned by the government, and the latter are not less ships of war, for being also employed in commerce. But goods found on board of a public armed ship, are condemned as of course. No claim is ever given for them. Chit. Law Nat. 296–300; 2 Azuni, Mar. Law, 109, 145, 193–195, 201; Bynk. Law War, 100–112; Vattel, Bk. 3, c. 7, § 115; Id. p. 516. To ship goods on board of an armed ship of the enemy, whether public or private, is an interference with the acknowledged right of search.

2. By the fifteenth article of the treaty between the United States and Spain, the principle, "that free ships shall make free goods," is expressly recognised. The converse results of course. Spain confiscates the goods of neutrals found on board of enemies' ships. Upon the principle of reciprocity, therefore, which Spain has recognised (2 Azuni, Mar. Law, 193; 2 Valin, 233, 254, 255; Valin, Des Prises, tom. 2, 252, art. 7; D'Abreu, pt. 1, c. 8. § 6; Id. c. 9, § 17; Span. Ord. 1718, 1741), the same law is to be enforced against her subjects.

W. Sullivan, for claimant.

The question is simply, whether goods of a friend on board of an enemy's ship are subject to condemnation? The law of war makes no distinction between an armed and an unarmed ship.

1. By the law of nations, Spain, after the war, retained the right, which she before had, to transport goods, excepting contraband, for her colonies in British ships. 1 Azuni, Mar. Law, 8–10, 77, 85, 90; Chit. Law Nat. c. 4, pp. 108, 109.

2. The law of nations in no way impairs this right, nor does it restrict the neutral to unarmed ships. Vattel, bk. 3, c. 7, § 115, p. 407; 2 Azuni, Mar. Law, 193; Heinec. c. 9, § 3; Grot. lib. 3, c. 16, § 6; Huber. tom. 1, c. 9, § 1; Chit. Law Nat. 296–300.

3. If we look to the conventional law, we find that for several centuries, the goods of neutrals on board of enemy's ships have been recognised as exempt from forfeiture. 2 Azuni, Mar. Law, 109–145.

4. The United States, by their public acts, have repeatedly manifested, that the law is so understood and received by them. In all their treaties it has been their aim to enlarge the freedom of neutral trade. by communicating to the cargo the neutrality of the ship. It is to be supposed, that, in pursuance of the same system, they uphold the principle, that the neutrality of the goods is not affected by the hostile character of the ship. Accordingly we find, that wherever the opposite rule is intended to be adopted, an express provision is thought necessary. See Treaty with Holland. arts. 3, 5, 10, 11, and 12; Treaty of 1794 wi... Great Britain, art. 17; Treaty with Morocco, art. 3; Algiers, art. 3; Tripoli, art. 2; Tunis, art. 3; Prussia, art. 2; French Republic, §§ 15. 16.

5. The treaty with Spain, which has been cited on the other side, discovers the same solicitude to preserve and extend the rights of neutrals, and to secure the freedom of navigation. Articles 15, 16.

6. The ordinance of Spain also cited for the captors,[3] has not been enforced against us, nor can it be supposed, that it will ever be. No nation, but France and Spain, has ever

[3] The following is the passage alluded to, as we find it in the French translation of D'Abreu: "Sa majesté étant instruite, que les Anglois se saisissoient des effets de nos Espagnols trouvés à bord des vaisseaux Français et Hollandais, comme on pouvoit le prouver par plusieurs exemples, elle ordonna, en date du 12 Mai. 1741, que sans entrer dans des discussions sur le fondement, que leur prétention pouvoit avoir dans les traités, elle ne croyoit pas qu'ils eussent un juste motif de plainte; que les biens des Anglois trouvés à bord des navires Français et Hollandais, étoient traités comme ceux des Espagnols en mêmes circonstances; qu'aussitôt que les ministres de France et de Hollande auroient fait en sorte, que les Anglois respectassent les vaisseaux de ces deux puissances à l'égard des biens des Espagnols: sa majesté feroit examiner ce point des traités, afin que tout fût exécuté avec l'égalité et la réciprocité convenable." Paragraph I, c. 9, § 17.

made such ordinances. 2 Valin, 252. The right of search is confined to neutral ships, and its object is the discovery of enemy's property. As to belligerent vessels, it can have no place, being merged in the general rights of war.

Mr. Dexter, in reply.

1. The goods of a friend found on board of an armed cruiser of the enemy, with or without actual resistance, are lawful prize. That neutral goods on board of an enemy's ship, are not, for that cause, subject to condemnation, is admitted as the general doctrine of the laws of nations. But this doctrine has qualifications and exceptions. There are many acts, by which the neutral may expose his property to be treated as that of the enemy. Among these must be the lading of his goods on board of an enemy's armed ship. He may, it is true, pass and repass, and transport his merchandise upon the ocean, as he might do before the war, subject only to the rights of the belligerent. But he invades these rights, when he employs the enemy to transport his property and to protect it by force. It is employing the commander and crew of the belligerent to resist the right of search, or, in other words, the right to know, with respect to every ship, whether she has enemy's goods on board. The moment the neutral places his property in a situation, where it is no longer open to examination and search, he departs from his neutrality, and his goods become confounded with those of the enemy. Nor does it make any difference, whether the armed ship be public or private. The latter, though employed in commerce, are completely vessels of war, possessing all the rights of such, and subject to the same rules.

2. Whether this general doctrine be true or not, yet if in fact there has been resistance, it comes within the principle of cases already decided and generally acquiesced in. Resistance made by the enemy, for the benefit of the neutral, is the same, as if made by himself. Was there then resistance in this case? It was certainly threatened, for the captured ship, having twelve guns, was in complete readiness to fire, and nothing but false information induced a surrender. This, in legal contemplation, was resistance. If the ship attempting search or capture be deterred by a threat of resistance, is not the belligerent as much impeded in the exercise of his right, as if he had been repelled or sunk? How much is necessary to make a combat? If the Argus had first fired, and the British ship had immediately struck, without firing a gun in return, it will not be denied, that this would have been a combat, and a reduction by a superior force. An assault is committed at common law, if an arm be but raised in menace. So between these ships, there was, on the part of the London Packet, an assault. Had the commander of the Argus fired, as he had a right to do, no

doubt would have remained. The humanity, which made him omit this, ought not to place him in a worse situation.

3. The effect and meaning of the article in the treaty with Spain is, that the character of the ship determines that of the property. The stipulation that "free ships shall make free goods" is put as a part for the whole. The object was to avoid the inconvenience of search in all cases, whether for enemy's property on board of neutral ships, or for neutral property, in order to distinguish and save it, on board of hostile ships. If this were not the intention, the belligerent would make a concession without any equivalent. The passages read from Azuni and D'Abreu completely show, that the subject is viewed in this light by Spain. Certain it is, that there is a Spanish ordinance making neutral goods on board of enemy's ships lawful prize. D'Abreu, pt. I, c. 8, § 6; Ord. 1718. To reciprocate such a provision would be according to the common practice of nations. This is familiar in cases of salvage, which is only a particular instance under the general rule.[4]

After this argument, an order for farther proof was made by the court, upon the grounds which will appear in the following opinion:

STORY, Circuit Justice. The British ship London Packet was captured by the private armed brig Argus, Henry Parsons commander, on or about the 30th day of August, 1813, on a voyage from Buenos Ayres to London, and brought into Boston for adjudication. On the trial in the district court, the ship and all the cargo, excepting 6276 hides, was condemned as enemy's property. The hides were claimed by the Spanish consul as Spanish property, and were finally restored, after an order for farther proof. From this decree of restoration, an appeal has been interposed to this court. There were no invoices of the cargo brought in, but bills of lading only, and the master was released at sea, and put on board of another vessel. The preparatory evidence, therefore, is not of such confidential persons, as may be, and usually are, entrusted with the knowledge of the ownership of the property. There was also an irregularity in not bringing in all the papers found on

---

[4] The principal questions here argued have since been determined by the supreme court of the United States in The Nereide, 9 Cranch [13 U. S.] 388. It was there held that actual resistance by the master of an enemy's armed ship did not affect the property of a neutral shipper with forfeiture, unless such neutral shipper coöperated in the resistance. It appears, however, that Sir William Scott, about the same time, decided the same question in a contrary manner. The Fanny, 1 Dod. 443. The supreme court also, in the same case, decided, that the clause in the Spanish treaty, "that free ships make free goods," did not imply the converse rule, "that enemy's ships make enemy's goods"; and farther, that even if Spain applied the converse rule to the United States, the courts of the United States were not in such a case at liberty to apply the rule of reciprocity.

board of the ship at the time of the capture. Some of the papers, which are asserted to have been of a private nature, are shown to have been delivered back to the master; and we are left without any letters, or customary documents to explain the transaction of the voyage. It is not for captors to undertake to decide upon the materiality of papers, upon any opinion of their own. They are bound to bring in all the papers, and leave the court to decide upon their real character and consequence. If they conduct themselves in a different manner, it is at their own peril; and they must expect to receive no countenance or assistance from the court, in aid of their own irregularity. I make this remark from an anxious desire to preserve the utmost exactness in prize proceedings, in as much as they not only affect the rights of our own citizens, but involve the most important interests of neutral nations. It is equally due to our public character as a belligerent nation, and to the integrity of our courts administering prize law, to discountenance every abuse, and every irregularity, which shall justly have a tendency, in the opinion of foreign sovereigns, to bring into doubt our scrupulous respect for the rights of neutrality, which on other occasions we have so strenuously maintained. Under all the circumstances of this case, I shall confirm the order of the district court for farther proof, and postpone a decision until that can be brought in.

At the succeeding term (May, 1815) the counsel of the claimant moved the court farther to postpone the cause, upon the ground, that by reason of the difficulty of communication, no return had yet been received to the commission sent out under the order for farther proof.

Mr. Blake, Dist. Atty., opposed this, contending that the claim of the consul, being without authority from the shipper, was not such a claim, as would protect the property from the operation of the rule, inflexibly observed in admiralty courts, that condemnation passes after a year and day.

STORY, Circuit Justice, granted the postponement, observing that this case differed from those, to which the rule of a year and day applied. There had been a claim. A consul was authorized to claim in behalf of subjects of his country. It was admitted in other countries, and he should be sorry, if a different rule were to prevail here. It was also to be considered, that in this case, the captain had not been brought in, nor had all the papers. If they had been, a different case, perhaps, would have been exhibited.

At the present term, the farther proof having been brought in, the following decree was delivered:

STORY, Circuit Justice. The only question now before the court is, as to the proprietary interest of 6276 hides, claimed as the property of D. J. Marino, a Spanish subject, living at Buenos Ayres. The claim was ordered to farther proof in the district court, and after a considerable lapse of time, that proof has now been brought in. It establishes to my entire satisfaction the national character and domicil of the claimant, and that the hides were originally shipped by him. This however is but a very inconsiderable advance towards the establishment of the proposition, that the goods, during their transit, were at his risk, and on his account. The shipment was in an enemy's vessel, on a voyage to London, a port in the enemy's country; and under such circumstances a legal presumption arises, that it belonged to an enemy, which presumption can be rebutted only by clear and distinct proofs of a neutral interest. The sole paper found on board at the time of capture, touching this shipment, was a bill of lading, which declares the hides to be shipped on account and risk of the claimant, consigned to Don Antonio Daubana, and, if absent, to William Hieland. There were no invoices, or letters of advice, respecting this, or indeed any other shipment to any of the consignees. This is a most extraordinary circumstance, and scarcely to be accounted for upon any other supposition, than that there has been a subtraction and concealment of the ship's papers by the enemy's master, or by some other person. At all events, it called upon the claimant to offer the most explicit and decisive proofs of the integrity of his claim. And if the proofs should be doubtful, it could not but authorize the most unfavorable presumptions.

What then is the state of the farther proof now offered to the court? There is not any affidavit by the claimant, or his confidential agent or clerk, at the time of the shipment, of his interest in the cargo. This is the usual, and I had almost said the universal document, expected and required by prize tribunals. Its absence unavoidably throws a suspicion over the cause; and as it is wholly unaccounted for, it authorizes me to believe, that there has been a voluntary, if not a studied, omission on the part of the claimant. The only paper in support of the claim is a paper purporting to be a copy of an original letter, which accompanied the shipment. But it is not a little remarkable, that this document stands altogether naked of any attestations of genuineness by the claimant himself or by any confidential clerk in his counting-room, or by any comparison by a public officer of its contents with the original letter-book of the claimant. It is simply stated by a gentleman, calling himself the general attorney and conductor of the house of the claimant, to be a true copy. This may be true, and yet the paper, from which it is copied, might have been the spurious production of the same day. Something more was surely necessary to entitle it to credit. It ought at least to have been proved, when

the original was written, by what vessel it was transmitted to the consignee, and from what paper the present copy was made, with the other usual attestations of its genuineness, by persons conversant with the transactions at the time when the shipment was made.

Under such circumstances, I cannot say that the presumption arising from the shipment in an enemy's vessel is so far repelled, that restoration of the property ought to be made. I therefore decree condemnation of the hides, as good and lawful prize to the captors, with their costs and expenses.

After the above decree was pronounced, and an appeal entered therefrom, the claimant, stating that he was now in possession of the affidavit of Marino showing the property to be in him, prayed that the case might again be opened; at least so far as to make this evidence a part of it.

STORY, Circuit Justice, said, if the decision here were final, he should think it reasonable to open the case, and to examine the farther evidence; and after an appeal, he considered it competent for the court to allow the evidence to be placed on the record with a memorandum, that it was brought in after the appeal. An order was accordingly entered, that the affidavit be placed on file, and transmitted with the record to the supreme court de bene esse, subject to the order of that court.

[NOTE. At February term, 1817, this cause was heard in the supreme court, and upon the hearing ordered to further proof, with a direction to produce the original documents referred to in the proofs before the court. 2 Wheat. [15 U. S.] 371. Additional evidence was thereupon adduced, consisting of documents from the customhouses at Buenos Ayres, of the testimony of the consignee in London, and the affidavit of Mr. Marino. These documents establishing satisfactorily the fact that the proprietary interest in the hides was at the time of shipment and of capture in the claimant, Mr. Justice Livingstone, delivering the opinion of the court, rendered a decree reversing the sentence of the circuit court, and restoring the hides to the claimant. In consideration of the captors' great expenses, however, caused by the delay of the claimant in producing evidence, it was ordered that the claimant pay to the libelants their costs and expenses in this suit. 5 Wheat. (18 U. S.) 132.]