ROBERT M. HARRISON, UNITED STATES CONSUL, PLAINTIFF, *v.* GEORGE C. VOSE.

An act of Congress passed on the 28th of February, 1803 (2 Stat. at Large, 203), declares that "it shall be the duty of every master or commander of a ship or vessel belonging to citizens of the United States, on his arrival at a foreign port, to deposit his register, sea-letter, and Mediterranean passport with the consul, commercial agent, or vice commercial agent, if any there be, at such port. In case of refusal or neglect of the said master or commander to deposit the papers as aforesaid, he shall forfeit and pay $500."

The arrival here spoken of means an arrival for purposes of business, requiring an entry and clearance and stay at the port so long as to require some of the acts connected with business; and not merely touching at a port for advices, or to ascertain the state of the market, or being driven in by an adverse wind and sailing again as soon as it changes.

Therefore, when a vessel arrived at the harbour of Kingston, Jamaica, and came to anchor at about a quarter of a mile from the town, but did not go up to the town, nor come to an entry, nor discharge any part of her cargo, nor take in passengers or cargo at Kingston, nor do any business except to communicate with the consignees, by whom the master was informed that his cargo was sold, deliverable at Savannah la Mar, the master was not liable to the penalty for omitting to deliver his papers to the consul.

THIS case came up from the Circuit Court of the United States for Maine, upon a certificate of division in opinion between the judges thereof.

Harrison *v.* Vose.

It was an action of debt for the penalty of five hundred dollars imposed by the statute (2 Stat. at Large, 203) which will be presently quoted, brought in the Circuit Court for Maine, in the name of Mr. Harrison, United States Consul at Kingston, in the island of Jamaica, against George C. Vose, master of the brig Openango.

By the second section of the act of 28th February, 1803, entitled "An act supplementary to the act concerning consuls and vice-consuls, and for the further protection of American seamen," it is enacted : — " That it shall be the duty of every master or commander of a ship or vessel, belonging to citizens of the United States, who shall sail from any port of the United States after the first day of May next, on his arrival at a foreign port, to deposit his register, sea-letter, and Mediterranean passport with the consul, vice-consul, commercial agent, or vice commercial agent (if any there be at such port); that in case of refusal or neglect of the said master or commander to deposit the said papers as aforesaid, he shall forfeit and pay five hundred dollars, to be recovered by the said consul, vice-consul, commercial agent, or vice commercial agent, in his own name, for the benefit of the United States, in any court of competent jurisdiction ; and it shall be the duty of such consul, vice-consul, commercial agent, or vice commercial agent, on such master or commander producing to him a clearance from the proper officer of the port where his ship or vessel may be, to deliver to the said master or commander all of his said papers.  Provided, such master or commander shall have complied with the provisions contained in this act, and those of the act to which this is a supplement."

The action was brought at the October term, 1847.  Vose appeared and pleaded *nil debet*, and the cause came on for trial at the same term.

The facts in proof in the case were as follows.

The brig Openango, belonging to citizens of the United States, George C. Vose (the defendant) master, sailed from Eastport, in the State of Maine, in the month of July, 1844, with a cargo of lumber, consigned to Messrs. Darrell & Barclay, merchants, of Kingston, in the island of Jamaica, and arrived at Port Royal, in the harbour of Kingston aforesaid, on the 4th day of September of the same year, and came to anchor at about a quarter of a mile from the town, but did not go up to the town, nor come to an entry, nor discharge any part of her cargo, nor take in cargo or passengers at Kingston, nor do any business, except to communicate with his consignees ; by

whom the master of said brig was informed that his cargo was sold, deliverable at Savannah la Mar.

The defendant on his arrival at Kingston, or at any time while said brig lay at anchor at Kingston, did not deposit his register, sea-letter, or Mediterranean passport with the plaintiff, who was the United States Consul at said port of Kingston at the time of the arrival of said brig there, as aforesaid.

After communicating with said consignees, the master of said brig, on the 5th day of said month of September, sailed in said brig from said port of Kingston to a place in said island of Jamaica called Savannah la Mar, where she arrived in due season, came to an entry, discharged her cargo, and where the said master deposited the register, sea-letter, and passport aforesaid with the vice-consul of the United States at said place called Savannah la Mar. One of the defendant's witnesses testified, that said brig arrived at Kingston in the afternoon of the 4th of September, and sailed from Kingston the next morning after her arrival there, and as soon as the wind would permit.

It was in proof, from one of the Kingston pilots, that the master of a vessel arriving at Kingston is compelled by law to report his arrival at the custom-house, whether his cargo had been previously sold, deliverable at another port, or not, but was under no necessity of coming to an entry.

At the trial, the following question occurred upon the foregoing testimony, to wit: —

Whether it was the duty of the defendant, who was master or commander of the ship or vessel called the Openango, on his arrival at Kingston, in the island of Jamaica, to deposit his register, sea-letter, and Mediterranean passport with the United States Consul at said port.

Upon which question, the judges of the said Circuit Court were opposed in opinion; and thereupon, upon the motion of the District Attorney, for and in behalf of the United States, it was ordered by the court, that the said question, upon which the said judges were so opposed, should be certified, under the seal of the court, to the Supreme Court of the United States, at their next session, for a final decision.

Levi Woodbury,<br>
<i>Associate Justice of Supreme Court.</i><br>
Ashur Ware,<br>
<i>District Judge.</i>

The cause was argued by *Mr. Johnson* (Attorney-General), for the plaintiff, no counsel appearing for the defendant.

*Mr. Johnson* said, that upon this question the opinions of

two courts below have been conflicting, and the present case has been brought up to have the true construction of the act settled. The cases are Toler *v.* White, Ware, 277, and Parsons *v.* Hunter, 2 Sumner, 419.

As bearing upon the question, the court is referred to the following acts. Collection Act of 10th August, 1790, § 16 *et seq.* (1 Statutes at Large, 158); Act concerning the Registering and Recording of Vessels (Ibid. 292); Coasting Trade Act, §§ 3, 15, 17, and 22 (Ibid. 306); United States *v.* Shackford, 5 Mason, 445.

There are also hereto annexed copies of two opinions given in the Attorney-General's office in relation to this subject.

· "*Attorney-General's Office, June* 11, 1845.

" Hon. James Buchanan, *Secretary of State.*

" Sir, — I have had the honor to receive your communication of the 16th April last, with a letter from the United States Consul at Nassau, asking my opinion on the question presented by the consul.

" He states, 'that his instructions to his agents have been to this effect, that any voluntary arrival at their ports obliges the master of the vessel upon his arrival to deposit his register, whether such arrival be for advices or not, or whether the vessel comes to an entry or not, and without respect to her remaining twenty-four hours, or any definite time, or not.' And the question presented for consideration is, Are those instructions warranted by law ?

" By the second section of the act of 28th February, 1803, it is made the duty of every master of a vessel, belonging to citizens of the United States, who shall sail from any part of the United States, on his arrival at a foreign port, to deposit his register, sea-letter, or Mediterranean passport with the consul, vice-consul, or commercial agent, if any there be at such port. In case of refusal or neglect, he is subjected to a penalty of five hundred dollars. And the same section makes it the duty of such consul, vice-consul, or commercial agent, 'on such master or commander producing to him a clearance, from the proper officer of the port where his ship or vessel may be, to deliver to the said master or commander all of his said papers.'

" Taking the whole section together, it is very obvious that Congress required the papers of an American vessel in a foreign port to be delivered to the consul only where it was necessary to make an entry at the custom-house. It is on the master's producing a clearance that the consul is to return him his papers, and there can be no clearance where there is no entry.

Harrison *v.* Vose.

If an American vessel arrive at her port of discharge, or if, for any reason other than the purpose of trading with the whole or portion of her cargo, she shall remain so long that by the law of the country an entry is required, she must enter at the custom-house of such port, and in all such cases the master must deposit his register. But the law does not extend the duty beyond this. A requisition of a deposit of papers, in all cases of arrival, where by the local laws an entry is not necessary, and where there is no trading or purpose to trade, might add to consular emoluments, but would prove extremely embarrassing to the navigating interest. The object of the law is to compel masters of vessels belonging to American owners, sailing from American ports, to respect our own laws, and those of the foreign countries to whose ports they may go for the purpose of trade; and this object is attained by requiring them to exhibit the evidence of their being lawful traders to our consuls, at the ports where they have to enter. Beyond this, neither the law nor good policy requires that their duty shall extend.

"I have the honor to be, respectfully, Sir, your obedient servant,

"Jno. Y. Mason."

"*Attorney-General's Office, September* 26, 1849.

"Hon. John M. Clayton, *Secretary of State.*

"Sir, — The question you have submitted to this office, upon the letter of F. H. Whitmore, Esq., of New Haven, Connecticut, of the 10th September, 1849, 'respecting the demand made by the United States commercial agent at St. Thomas, in all cases of the arrival at that port of an American vessel, whether business is or is not done by her, that the register, &c., be deposited with him,' I have considered.

"The legality of the demand depends upon the proper construction of the second section of the act of Congress of the 28th February, 1803, supplementary to the 'Act concerning consuls and vice-consuls, and for the further protection of American seamen.' 2 Statutes at Large, 203.

"By the words of the first part of the section, the master of an American vessel, sailing from a port in the United States, is required to deposit his register, sea-letter, and Mediterranean passport, 'upon his arrival at a foreign port,' with the American consul, &c., &c., if there be one at such port. The duty, regarding this part of the section, only exists upon arrival, without reference to its object, and whether it be voluntary and for business, or otherwise. But the subsequent part qualifies, I think, the general words of the first. It is in the pro-

vision that the consul, &c., on the master's 'producing to him a clearance from the proper officer of the port where his ship or vessel may be,' shall deliver to him 'all of his said papers.' Construing the two clauses together, I think the true meaning of the whole is, that there is to be no deposit of the papers upon an arrival, unless it be an arrival with a view to entry, or where by the local law an entry is required. Where either exists, my opinion is, the deposit with the consul, &c., is to be made ; and of course it is the duty of the consul to demand it. It will be seen, I think, that in this view of the case I but concur in the opinion to which you refer, of Mr. Attorney-General Mason, of the 11th of June, 1845.

" After quoting the section of the act in question, he says, ' Taking the whole together, it is obvious that Congress required the papers, &c., to be delivered to the consul only when it was necessary to make an entry at the custom-house' ; and therefore, ' if an American vessel arrive at her port of discharge, or if, for any reason other than the purpose of trading with the whole or portion of her cargo, she shall remain so long that, by the law of the country, she must enter at the custom-house of such port,' the deposit must be made.

" Interpreting the section as I do, to require the deposit only when an entry is to be made, he makes it the duty of the master, as I do, to deposit, in case of entry in port, without regard to the manner or object of its being made. The motive for the deposit is, I think, the same in all cases of actual entry, and the trouble and duty of the consul, &c., the same. He is in both cases to take charge of the vessel's papers, and to hold them until she is again cleared, and for the trouble of receiving, preserving, and delivering them (of each of which acts he is to give a certificate under seal), he is entitled to charge two dollars. See chapter 8, section 7, of General Instructions to Consuls, of the 6th June, 1849.

" The result, then, to which I come is this, that the commercial agent at St. Thomas, in the case of all American vessels arriving there, and remaining so long as by the local regulation to be obliged to enter, and afterwards to clear, is entitled, and it is his duty to demand, the surrender of their papers, under the act of 1803, no matter what may be the motive of the entry, whether from business or not.

" I have the honor to be, Sir, your obedient servant,

" REVERDY JOHNSON."

Mr. Justice WOODBURY delivered the opinion of the court. The question in this case, on which the judges below have

32 *

presented a difference in opinion, is one of commercial importance, and of no little difficulty.

The provisions in the act of Congress of February 28, 1803, under which the penalty is claimed by the plaintiff from the defendant, declare, " that it shall be the duty of every master or commander of a ship or vessel belonging to citizens of the United States," " on his arrival at a foreign port, to deposit his register, sea-letter, and Mediterranean passport with the consul, vice-consul, commercial agent, or vice commercial agent, if any there be at such port." 2 Statutes at Large, 203, § 2.

The law then adds, " that in case of refusal or neglect of the said master or commander to deposit the said papers as aforesaid, he shall forfeit and pay $ 500." There is no clew in this act itself to the meaning of the word *arrival*, or to the object and design of the act, so as to judge whether it has or has not in this instance been violated, except another provision in the close of the same section, that the consul shall, " on such master or commander producing to him a clearance from the proper officer of the port where his ship or vessel may be, deliver to the said master or commander all of his said papers, provided such master or commander shall have complied with the provisions contained in this act and those of the act to which this is a supplement."

Of course, we must in this, as in all cases, begin the inquiry with the presumption that the defendant is innocent, and that the burden of proof to make out the guilt devolves on the plaintiff. In the construction of a penal statute, it is well settled, also, that all reasonable doubts concerning its meaning ought to operate in favor of the respondent. In the United States v. Shackford, 5 Mason, 445, Justice Story says, " It would be highly inconvenient, not to say unjust, to make every doubtful phrase a drag-net for penalties." (p. 450.)

This principle of construction does not make an exception in the act not made by Congress, as is sometimes objected, but it recognizes a limitation allowed or required by the act itself, in order to give to it what it must reasonably be supposed the legislature designed, a natural and obvious intent. Thus, no law of Congress could ever be properly construed as an intention to punish involuntary acts, such as what is done by force of a storm or an enemy.

It is settled, too, that, where penalties are to be recovered, greater fulness of evidence is necessary to make out such a case as the law contemplates. United States v. Wilson, 1 Baldwin, C. C. 101; Greenleaf on Ev., § 65. The proof must, then, bring a transaction within the spirit as well as letter of the law, and must usually show a plain breach of both.

In The Enterprise, 1 Paine, C. C. 32, it is said, that one shall not incur a penalty in cases of doubt, and courts should not extend a construction beyond what is clear in such cases. See further on this, Taber's case, 1 Story, 6; and 1 Story, 255 and 256; and Sloop Elizabeth, 1 Paine, C. C. 11.

Taking this rule of construction with us, the inquiry is, whether the words " arrival at a foreign port," as used in the first portion of the second section, and on which arrival the master is to deposit his papers, mean any touching at a foreign port for any time, however short, or for any purpose or reason whatever, or only an arrival to transact commercial business, followed in due time by an entry of the vessel.

Sometimes the arrival of a vessel refers, undoubtedly, to her coming into a port from any cause, or for any purpose, and for any period. It is admitted that this may be the literal and general meaning of the term with lexicographers, but in several cases it is used to denote a coming in for certain special objects of business, and to be followed by remaining there so long as to render an entry of the vessel proper, and a deposit of her papers with a consul prudent and useful.

Thus it is, as to an arrival of a vessel, when she enters a port or harbour in order to close an outward or inward voyage. It is usually a coming to the place of the vessel's destination for her business, and waiting to transact it. It is with a view to stop over twenty-four or forty-eight hours, so as to be obliged by express law or general usage to enter the vessel and cargo, or to sell, or deliver, or purchase a cargo. It is under such circumstances as seem likely to need a consul's advice or assistance, and as give time to come properly under his supervision and jurisdiction.

Which of these ideas was meant by the legislature to be attached to the word " arrival," in this law, is the chief question to be ascertained. If it was the latter meaning, namely, an arrival for business, and to remain long enough to make an entry and clearance proper, then the respondent does not appear to have violated the spirit of the act of Congress, though in other senses of the word his vessel had arrived temporarily at the port of Kingston.

On examination, the words *arrive* and *arrival*, when used in respect to matters of this kind in acts of Congress, will, in several instances, appear to be used in the last sense, as applicable only to an arrival to enter and clear for business. Thus, in the thirteenth section of the act of December 31, 1792, the requirement that a temporary register of a vessel, instead of one lost, shall be delivered up " within ten days after her first *arrival*

within the district to which she belongs," means, not touching or inquiring only, but arriving to enter and transact business. (Ware, 281.)

So in the thirty-first section of the Collection Act, custom-house officers may board a vessel within four leagues of the coast and put seals on boxes, &c., " and if, upon her *arrival* at the port of her entry," they are found broken, &c., a penalty is incurred. (1 Stat. at Large, 165.) This manifestly means an arrival to enter for business.

It is well known, that such has always been the practical construction of the act of Congress of 1803, by the mercantile and navigating community, and hence, for a quarter of a century after its passage, no case of a prosecution for violating it appears in the books. Indeed, it has been judicially settled in 5 Mason, 446, before cited, that the word *arrival*, as used in that case, which was very analogous, means an arrival for such a business purpose. There the third section of the act of 1793, ch. 52, provided that a temporary register should, " within ten days after the *arrival* of such ship or vessel within the district to which she belongs, be delivered to the collector of said district, and be by him cancelled."

The vessel in that case belonged to Eastport, and was destined to New York, with a cargo from New Brunswick, and after sailing arrived and stopped two hours in the District of Passamaquoddy, including Eastport, for a tide, and put ashore some passengers and took in others, and then departed for New York, her place of final destination ; but she did not enter or clear, and was held not to come within the above penal provision.

Beside these analogies, showing the restricted meaning attached to the word *arrival* in several laws connected with navigation, the latter clause of this very act of 1803 contains a provision on this subject, which indicates clearly the design that the arrival must be one so long, and with such a purpose, as to require an entry of the vessel.

In construing all statutes, the whole of them must be scrutinized in order to decide on the meaning of particular parts. 11 Mod. 161; Stowell *v.* Zouch, Plowden, 365; 8 Mod. 8; Bac. Abr., Statute, I. 2; Co. Lit. 381, *a.* This eviscerates the true meaning from the law itself, — *ex visceribus actus.*

In the other portion of this section, after the provision that the papers be delivered to the consul on the arrival of the vessel, he is required to return them only " on such master or commander producing to him a clearance from the proper officer of the port where his ship or vessel may be." Yet such a

clearance cannot be produced unless the vessel has first entered at the custom-house. Hence the conclusion seems irresistible, that it was not designed to require the master to deliver his papers to the consul, unless arriving with a view to enter his vessel for the transaction of business, and stopping so long as to render such an entry proper for security of the revenue and the supervision of the consul over her business and crew.

The acts of Congress do not make such entry imperative, in most cases, till after twenty-four hours, and in some, not till forty-eight hours (1 Stat. at Large, 158; § 16). The rule as to this abroad is probably similar; and as this vessel stopped for a less time, and did no business there, she does not appear to have been required by the local authorities to enter, nor did the master enter her of his own accord. Consequently, no clearance could be presented to the consul to obtain his papers, if they had been delivered, and therefore it does not seem to have been a case contemplated for such a delivery.

Again, a vessel is not considered to *arrive*, so as to be regarded as importing her cargo, unless she arrives within a port and with an intent to enter the cargo. United States *v.* Lyman, 1 Mason, C. C. 482. It is not enough to come within the limits of the district. United States *v.* Vowell, 5 Cranch, 372.

So the acts of Congress expressly provide, that she need not enter at a port where she arrives, if she desires to go farther to an interior port. Act of 4th August, 1790, § 15 (1 Stat. at Large, 158).

Nor does the master appear in this case to have forborne to enter and afterwards obtain a clearance from any fraud or evasion. He did not stop the usual time to require an entry, he needed no entry as he found that he had no business to transact there, he wanted no aid or advice of the consul, nor did his crew, so far as the evidence goes, and he might well, under such circumstances, proceed farther to his finally destined port, without incurring the expenses of an entry and clearance, and the payment of tonnage duties, merely to enable him to deliver his papers to the consul, and immediately receive them back again.

The proviso of the act seems to indicate that the papers are delivered to the consul chiefly as security for two purposes; viz. the payment of extra wages to seamen discharged, and the taking on board destitute seamen when bound home ; and hence, if the master does not perform what is thus required, he is not entitled to his papers again, even after an entry and clearance. But as no seamen were discharged here, and as this vessel was not bound homeward, there was no public duty

Harrison *v.* Vose.

or policy of this kind to be attained, by showing her papers to the consul. Nor does it appear that the crew had any grievances to lay before him, which were thus delayed. Indeed, the vessel sailed only a few miles farther, to a neighbouring port, and entered there, where every consular protection and redress were equally open and could equally subserve any public end of this kind in view in enacting the law now under consideration. And while we feel a strong disposition to shield seamen from oppression, and will go for that purpose, in proper cases, to any extent justifiable by law, we must take care that what is intended as a shield to one class shall not be perverted, without justification, into a weapon to vex and burden another class alike meritorious.

It is conceded that a consul is the chief representative and agent of his country in most foreign ports, and as such is to be resorted to by his countrymen. But when a vessel has arrived so as to be required to deposit her papers with him, it would seem to be reasonable that she must intend to stay long enough to need or allow the exercise of some of his functions. Those functions are principally to watch over our trade, — actual exports and imports ; to exercise jurisdiction in some respects over American vessels and seamen abroad ; sometimes of a judicial character (3 Taunt. 162), when they stop and come ashore, or to transmit information home in relation to them.

To be sure, he has a few other duties to perform. But most of them are disconnected with this subject ; — as, to take care of American property, either wrecked or belonging to deceased persons ; to exercise at times even diplomatic functions ; to aid his countrymen in scientific researches ; to transmit periodical advices on every thing beneficial to trade or the arts, and, in all emergencies among strangers, to act as the friend and agent of commercial visitors from his own country. Vattel, Law of Nations, *Consuls ;* Warden's Consular Establishments ; 2 Elliot's Am. Dip. Code, 454 ; 7 Peters, 276 ; Bee's Adm. 209 ; 1 Statutes at Large, 254, and note ; 10 Wheat. 66 ; 1 Mason, 14 ; 1 McCulloch's Dict., *Consul,* 465 – 467 ; 2 Beawes's Lex Mercatoria, 42.

The first class of duties may have furnished some reasons for requiring that the papers of vessels be lodged with the consul after an arrival to stay and transact business, and that they remain with the consul till the vessel's clearance. All of that class look to an arrival for purposes of business, — to an entry and clearance, and to a stay there so long as to require some of the acts connected with it, and to need or permit the interference of the agent of their country in some of his appropriate

functions, and especially to enable him to report understandingly that her trade, or her imports and exports, are on American account, and are of a certain value and character.

Again, if a vessel on touching at a port for advices merely, or to ascertain the state of the market, and sailing again forthwith on obtaining them, or on being driven in by an adverse wind and sailing again when it changes, were considered as obliged to send her boat on shore and report to the consul, with her papers, often with unnecessary delay, and always with no object except mere information of her existence at a particular date, the law would be very burdensome without any adequate equivalent. More especially is this the case when this general information can be got and communicated without depositing the papers. If they must be left, they must frequently be lodged, and be forthwith taken back, and a clearance be obtained, though no entry had been made for business nor wished to be made.

Again, if this must be done whenever a vessel merely touches for a few hours on the outskirts of a port, where the city is ten, thirty, or one hundred miles up a river or bay at which the consul resides, — which is frequently the case, — the provision would be oppressive in the extreme. It might by needless delays defeat the whole benefits of the voyage, and sometimes lead to a loss of the insurance by those delays, or by deviations. It would cause much unnecessary expense in fees and tonnage duties and port charges, which Congress could never have meant to impose, when no business was to be transacted. It would embarrass and clog, rather than aid, commerce, which last is peculiarly the design and policy of legislation by the general government on this vital subject.

In some acts of Congress, it is expressly recognized as an excuse from a penalty in respect to a matter like this, if the vessel desires to go farther, to an interior port, or is driven about by stress of weather, by chase of an enemy, or any " other necessity," not saying whether voluntary or involuntary. (1 Stat. at Large, 158, 160, 167.)

And it would seem reasonable, not only to construe these penal acts as not designed for such cases, but to regard them as not meant for a touching merely to seek or give information, or to obtain a slight repair, or needed supplies, if it can be done, and the vessel can depart, before law or usage requires an entry.

If any doubt remains, that the arrival spoken of in this act was one to require an entry and clearance in connection with the delivery of the papers to the consul, it should be removed

by the provisions in the act of March 3d, 1817, made *in pari materia* (3 Statutes at Large, 362). Information thus obtained from similar sources is entitled to much weight. 1 Burrows, 447; Doug. 276; 15 Johns. 380. This statute enacts, that foreign vessels, arriving from countries where our consuls are allowed to have charge of the papers of an American vessel in port, must deposit with their consuls here their papers, within forty-eight hours after their entry; and that they be returned, when the master " produces to him (the consul) a clearance in due form from the collector of the port," &c.

Had Congress in this act, or in that under consideration in the present action, meant that the papers should be delivered to the consul whon no entry of the vessel was contemplated, why was not the provision made to deliver them before entry instead of afterwards, and to return them when she was ready to sail; and not on producing a clearance?

Our view, then, is, that the term *arrival*, as used in this act, must be construed according to the subject-matter, — to the object of the provision and the expressions in other sections of this act and in other like acts; and that, according to all these, a vessel putting into a foreign port to get information, and getting it without going at all to the upper harbour or wharfs, and not entering, or repairing, or breaking bulk, or discharging seamen, or being bound homewards so as to take seamen, or needing the aid of a consul in any respect, but leaving the port in a few hours, not doing any of these, nor being required to, and duly entering and delivering her cargo at a neighbouring port where it had been sold, and there depositing her papers with the vice-consul, cannot be said to have arrived at the first port, so as to come within the spirit of the penal provision, as to depositing her papers with the consul. So far as regards precedents on this matter, the actual decisions of one court and the opinions of two Attorneys-General are in favor of our conclusion; (see the case of Toler *v.* White, in Ware, D. C. 275;) while the decision in Parsons *v.* Hunter, 2 Sumner, 419, is not against it, though the reasoning is, and seems to unsettle the question.

See, also, the opinions of the law officers of the government at different periods, June 11th, 1845, and September 26th, 1849, coinciding that the arrival meant here must have been one followed by an entry and clearance. Their opinions, likewise, have without doubt been adopted by the government, and our consuls instructed to conform to them, and this furnishes an additional consideration for not disturbing what is in opera-

tion under them; and especially when a change would be merely to extend a severe penalty to a case doubtful in construction and characterized by good intentions.

The utmost which can be said is, that the master might have intended to enter his vessel at Kingston, if he found that the cargo had been sold there, but ascertaining it was not, he left at once in less than twenty-four hours, by the first fair wind, and before entering or being required to enter. The master, therefore, seems to have acted throughout in good faith, and with no intent to break the law in not depositing his papers at the first port; and it is so doubtful whether he has incurred a penalty, that we think a certificate must be given in his favor. Plowden, 20.

It is gratifying, in respect to this conclusion, that, if it be different from the design of Congress in this act, another can at once be passed, requiring expressly in every case, and at whatever delay and expense, that a deposit shall be made of papers with consuls by masters, on touching any part of a port, and for whatever purpose or cause, and for however short a period.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Maine, and on the point or question on which the judges of the said Circuit Court were opposed in opinion, and which was certified to this court for its opinion, agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this court, that, on the testimony in this case, it was not the duty of the defendant, who was master or commander of the ship or vessel called the Openango, on his arrival at Kingston, in the island of Jamaica, to deposit his register, sea-letter, and Mediterranean passport with the United States Consul at said port. Whereupon, it is now here ordered and adjudged by this court, that it be so certified to the said Circuit Court.