FRANKLIN SUGAR REFINING CO. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. January 4, 1906.)

No. 18.

CUSTOMS DUTIES—COUNTERVAILING DUTY BECAUSE OF EXPORT BOUNTY—SUGAR.

The "additional" duty imposed by Tariff Act of July 24, 1897, c. 11, § 5, 30 Stat. 205 [U. S. Comp. St. 1901, p. 1693] on articles or merchandise imported into the United States and upon which an export bounty has been paid by the country of production, and which it is provided shall be "equal to the net amount of such bounty," is leviable only upon the article or merchandise which enters the United States, and in case of merchandise dutiable by weight and as to which the bounty as declared by the Secretary of the Treasury is also by weight, such as sugar, where the quantity entered at the custom house as shown by the official weigher is less than that shown by the foreign invoice, the "additional" duty, like the regular duty, is assessable only on the quantity so entered, and the cause of the loss or shrinkage is immaterial. The mere diminution in the quantity of units of weight or measure of a commodity usually measured by such units is not such a change of condition "by remanufacture or otherwise," within the meaning of such section, as to authorize a resort to other than the usual means for ascertaining the amount of the additional duty.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 137 Fed. 655.

John G. Johnson, for appellant.
J. W. Thompson and Wm. M. Stewart, Jr., for the United States.

Before ACHESON, DALLAS and GRAY, Circuit Judges.

GRAY, Circuit Judge. The facts of this case are not in controversy, as the sole disputed question relates to the proper construction of section 5 of the Act of July 24, 1897 (30 Stat. 205, c. 11 [U. S. Comp. St. 1901, p. 1693]), in its application to the admitted state of facts. The language of said section is as follows:

"Sec. 5. That whenever any country, dependency, or colony shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation of any article or merchandise from such country, dependency, or colony, and such article or merchandise is dutiable under the provisions of this act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The net amount of all such bounties or grants shall be from time to time ascertained, deter-

mined, and declared by the Secretary of the Treasury, who shall make all needful regulations for the identification of such articles and merchandise and for the assessment and collection of such additional duties."

In pursuance of these provisions on December 12, 1898, the Secretary of the Treasury by a circular (Treasury Decisions, 20,407), directed to the officers of the customs and others concerned, stated that:

"The following amounts of bounties respectively paid, or bestowed directly or indirectly, on the export of sugars, by the countries hereinafter named, are hereby declared for the assessment of additional duties on sugars imported from, or the product of, such countries or their dependencies, viz., * * * Germany. 1. On raw sugar at least 90 per cent. polarization and on refine sugar under 98 per cent. and at least 90 per cent., 2.50 marks per 100 kilograms. 2. On candy and sugar in white, hard loaves, blocks, crystals, etc., at least 99½ per cent., 3.55 marks per 100 kilograms. 3. On all other sugar at least 98 per cent., 3 marks per 100 kilograms."

An importation of sugar was made by the appellant, from Germany into this country, by the steamship "Pilgrim," arriving at the port in Philadelphia, February 28, 1899. The sugar as consigned to the appellant company, was contained in 43,257 bags, whose weight, according to the invoice, was 9,536,348 pounds. The weight returned by the U. S. weigher at the port of Philadelphia was 9,301,396 pounds, being less than the invoice weight of the 43,257 bags of sugar by 235,042 pounds. Upon the entry of this sugar at Philadelphia, the collector imposed the regular duty on the sugar imported, assessing the same upon its landed weight here, viz., 9,301,396 pounds; but the additional duty imposed by section 5 of the act of 1897, above quoted, was assessed upon the invoice weight of the sugar, viz., 9,536,436 pounds, at the rate of 2.50 marks per 100 kilograms, that being the rate or amount of the bounty paid by the German government upon exported sugar, as ascertained and declared in the last previous statement of the Treasury Department of the United States. The additional duty, therefore, at the rate of 2.50 marks per 100 kilograms was imposed, not only upon the 9,301,396 pounds of sugar actually imported, and upon which the regular duty was assessed, but also upon 235,042 pounds that were not imported. The appellant claimed that this additional duty should have been levied, as the regular duty was levied upon the sugar, on the basis of its landed weight in the United States, instead of upon its invoice weight, and filed its protest to that effect. This protest came before the Board of General Appraisers at New York, who decided, in an opinion by the majority of the board, against the contention of the appellant, General Appraiser Somerville filing a dissenting opinion. From this decision an appeal was taken to the United States Circuit Court for the Eastern District of Pennsylvania, where, after the production of additional evidence, the opinion of the majority of the Board of Appraisers was adopted and the decision of the board affirmed. 137 Fed. 655. The present appeal is from this decision.

We cannot agree with the conclusions arrived at by the majority of the Board of Appraisers, and by the learned judge of the court below. No difficulty of interpretation presents itself to a careful reading of section 5 of the revenue act of 1897. By its plain lan-

guage an additional duty to the regular duty imposed upon sugar "imported from foreign countries" is imposed upon the "importation" of such sugar from any country, paying a bounty upon the exportation thereof "equal to the net amount of such bounty or grant." It seems to us very clear that the net amount of such bounty must mean that which was paid or payable upon the sugar actually imported, the express terms of the act being that said additional duty is only leviable "upon the importation of any such article or merchandise into the United States." If there ever could have been any doubt as to the meaning of "imports" and "importation," as bases of customs taxation, that doubt was long ago removed by the Supreme Court, in the case of Marriott v. Brune, 9 How. 619, 13 L. Ed. 282. In the course of its opinion, the Supreme Court says:

"The collector here exacted that rate on the quantity of sugar named in the invoice and shipped from foreign ports. But the quantity which arrived and was entered here was less than that shipped, by drainage and waste, to the extent of near 5 per cent.; and the defendants contended that the duty should be paid only on the diminished quantity. The general principle applicable to such a case would seem to be, that revenue should be collected only from the quantity or weight which arrives here. That is, what is imported,—for nothing is imported till it comes within the limits of a port. See cases cited in Harrison v. Vose, 9 How. 372, 13 L. Ed. 179. And by express provision in all our revenue laws, duties are imposed only on imports from foreign countries; or the importation from them, or what is imported. Chapter 270, 5 Stat. 548, 558. The very act of 1846 under consideration imposes the duty on what is "imported from foreign countries." [9 Stat. 42, c. 74.] The Constitution uses like language on this subject. Article 1, §§ 8, 9. Indeed, the general definition of customs confirms this view; for, says McCulloch (volume 1, p. 548), 'customs are duties charged upon commodities on their being imported into or exported from a country.' As to imports, they therefore can cover nothing which is not actually brought into our limits. That is the whole amount which is entered at the custom-house; that is all which goes into the consumption of the country; that, and that alone. is what comes in competition with our domestic manufactures; and we are unable to see any principle of public policy which requires the words of the act of Congress to be extended so as to embrace more. When the duty was specific on this article, being a certain rate per pound, before the act of 1846. it could of course extend to no larger number of pounds than was actually entered. The change in the law has been merely in the rate and form of the duty, and not in the quantity on which it should be assessed. On looking a little further into the principles of the case, it will be seen that a deduction must be made from the quantity shipped abroad, whenever it does not at all reach the United States, or we shall in truth assess here what does not exist here. The collection of revenue on an article not existing, and never coming into the country would be an anomaly, a mere fiction of law, and is not to be countenanced where not expressed in acts of Congress, nor required to enforce just rights. It is also the quantity actually received here by which alone the importer is benefited. It is all he can sell again to customers. It is all he can consume. It is all he can re-export for drawback. * * * Consequently, where a portion of the shipment in cases like these does not arrive here, and hence does not come under the possession and cognizance of the custom-house officers, it cannot, as heretofore shown, be taxed on any ground of law or of truth and propriety. * * * Such is the case of a portion being lost by perils of the sea, or by being thrown overboard to save the ship; or by fire, or piracy, or larceny, or barratry, or a sale and delivery on the voyage, or by natural decay. If there be a material loss, it can make no difference to the sufferer or the government whether it happened by natural or artificial causes. In either case, the article to that extent is not here to be

assessed, nor to be of any value to the owner. To add to such unfortunate losses, the burden of a duty on them, imposed afterwards, would be an uncalled-for aggravation, would be adding cruelty to misfortune, and would not be justified by any sound reason or any express provision of law."

The principle and philosophy of this decision has been recognized and followed by the Supreme Court and the federal courts down to the present time. U. S. v. Southmayd et al., 9 How. 637, 646, 13 L. Ed. 290; Amer. Sugar Refining Co. v. U. S., 181 U. S. 610, 21 Sup. Ct. 830, 45 L. Ed. 1024; Lawder v. Stone, 187 U. S. 281, 286, 23 Sup. Ct. 79, 47 L. Ed. 178; U. S. v. Nash Spaulding & Co., 4 Cliff. 107, Fed Cas. No. 15,856; Amer. Sugar Refining Co. v. U. S., 99 Fed. 716, 40 C. C. A. 84.

Where the merchandise in question is universally dealt with in units of weight or measure, as is the case, for instance, with sugar or with grain, export bounties, as well as import duties, conform to such universal usage and habits of thought by being apportioned to such units of weight and measure. Such merchandise being always bought, sold, measured, valued, and even thought of by such units, it is hard to conceive of any other method by which export or import taxation could be imposed and regulated. If one has, therefore, received a bounty from the country of export upon a greater amount or more articles of merchandise than he actually imports, nothing in the language of this section of the act can justify taking by way of additional duty a greater sum than in the aggregate has been paid as bounty upon the several articles or units of merchandise actually imported. Accordingly, we find that the Secretary of the Treasury, in conforming to the requirement of section 5, has determined and declared the net amount of such bounties in the form in which presumably they have been allowed, that is, a rate of so much per given weight, the rate in the present case being 2.40 or 2.50 marks per 100 kilograms. Our tariff act says that upon the units of merchandise imported, that is, actually brought into the country, there shall be paid, first, a certain rate of tax on each unit so brought in, and an additional tax equal to the amount of bounty paid upon such "importation," that is necessarily the bounty paid upon each unit of the merchandise actually imported. It is, of course, conceded that the regular duty is imposed upon the units actually landed. There does not seem to us to be anything in the language of the whole section or of the act which requires that the duty additional to such regular duty should be levied upon any other basis. If, therefore, 1,000 units of merchandise—pounds of sugar or bushels of grain—are exported from a bounty paying country, by being loaded upon a ship, and the exporter has received for each unit, whether pound or bushel, the prescribed bounty, and only 900 units of weight or measure are imported or landed, the additional duty must be measured by the amount of bounty paid on each of the 900 units, for nothing else has been imported, and it matters not what has become of the units delivered from the export country and not received here. If 100 horses are exported from a country paying a bounty for export at so much a head, and on the voyage one horse dies or ten horses die and are thrown overboard, there can be no question, that both the regular duty and

the additional duty, would be levied only upon the 99 or 90 horses actually imported.

The argument of the appraisers and of the learned judge of the court below controverts this conclusion, upon what seems to us false premises. They assume an intent on the part of Congress to make the extra or countervailing duty equal to the entire export bounty paid by the foreign government on the "cargo" or "merchandise" exported. The majority of the Board of Appraisers say:

"The purpose of section 5 is to take from the importer the benefit received on his cargo, which when paid him practically amounts to a reduction of our dutiable rates, and any theory by which he can import his goods and pay less additional duty than the net amount of the bounty received by him, would operate to defeat the section."

This assumption, so far as it leaves out of sight the quantity of goods actually imported as the basis of taxation, we think unwarranted by the language of the section. The additional tax is not imposed upon an entity called a cargo, any more than the regular tax is so imposed, and the bounty that was paid was not on the cargo, but upon each unit of weight contained in the "importation." The protective feature or purpose of the act cannot justify, and does not require, so forced a construction. This language of the Supreme Court, in Marriott v. Brune, supra, as quoted by Judge Somerville, of the Board of Appraisers, in his dissenting opinion, is pertinent here:

"As to imports, they therefore can cover nothing which is not actually brought into our limits. That is the whole amount which is entered at the custom-house; that is all which goes into the consumption of the country; that, and that alone, is what comes in competition with our domestic manufactures; and we are unable to see any principle of public policy which requires the words of the act of Congress to be extended so as to embrace more."

The source of the confusion in the opinion of the appraisers and of the court below, seems to be a misunderstanding of the words "change in condition," as used in section 5 of the act. After premising the payment of a bounty by the exporting country, the language of the act is "then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production, or has been changed in condition by remanufacture or otherwise, there shall be levied and paid * * * in addition to the duties otherwise imposed by this act, an additional duty equal to the net amount of such bounty or grant, however the same shall be paid or bestowed." The evident meaning of this provision of the section is that any article imported from a bounty-paying country shall not escape the additional duty imposed by the act, by being remanufactured or changed so as to be brought into a classification different from that to which it originally belonged. In other words, that its identity as an article upon which bounty shall be paid, shall not be lost by any change of condition like that of remanufacture being accomplished, but the original article upon which the export bounty is paid, will be followed into any article imported, into

which it has in the meantime been incorporated. If yarn or pig iron are the subjects of bounty from the country of export, and the one be changed into cloth and the other changed into steel between the time of exportation and the time of importation into the United States, the bounty aided yarn and the bounty aided pig iron would still be subject to the additional duty in their changed condition, and some mode would have to be devised by which their presence could be detected and measured.

A mere diminution, however, in the quantity of units of weight or measure of a commodity, usually measured by such units, is not such a change of condition "by remanufacture or otherwise," as is evidently contemplated by the language of the act just quoted. Each pound of sugar is unchanged in condition, as each bushel of grain would be unchanged, in the sense meant by the act. If fewer gallons of oil, or bushels of grain, or pounds of sugar are actually imported or landed, than were exported or loaded on the ship, such diminution in the number of units is not a change in condition of what remain, even if considered in the mass or as a cargo. Yet, that it is such a change, seems to be the conclusion arrived at by the majority of the Board of Appraisers. They say in their opinion:

"Whether its weight became less or whether the cargo became otherwise changed in condition, by reason of remanufacture or otherwise, after exportation and before importation, does not matter; so long as the cargo shipped was imported into this country, it must pay additional duty and that additional duty must be equal in amount to the amount of bounty paid on the merchandise."

The reasoning upon which this conclusion rests is not satisfactory. It withdraws the attention from the express words of the act, that the additional duty is leviable only upon the "importation of any such article or merchandise into the United States," by an equivocal use of the word "merchandise," as if synonymous with the cargo placed upon the ship. The act is not speaking of a change in condition of a cargo qua cargo, but a change in condition of the articles or merchandise composing the cargo. The argument of the board and the court below takes the cargo as the unit, and, to quote from the brief of the appellant, they say in effect:

"A cargo of sugar was exported. On it you received a bounty. This cargo was imported. You must, therefore, under the statute repay to the United States the same bounty."

They treat the importation as being one of a "cargo," as if, upon the importation of some concrete article, such as a statue or a coach, a bounty being paid upon the exportation thereof, it was found that a leg was broken off the statue or a spoke out of one of the wheels of the coach had been lost, and they were insisting that the thing imported was still a statue or coach, and the additional duty measured by the bounty must still be paid. The fallacy of such reasoning is too apparent to need further discussion.

Inconsistently with the position thus taken, the majority of the Board of Appraisers in their opinion seem to concede, that if part of

the cargo, upon which export bounty is paid, is lost by the perils of the sea, the additional duty levied should only be equal to the amount of the export duty paid on what remained of the cargo and was actually imported. Such a loss or diminution in weight, they argue, was not due to what they call "natural causes," and therefore did not constitute such a "change in condition" as is contemplated in the statute. They then proceed to say, that where there is a shortage in weight at the port of entry, it is prima facie evidence that the same was due to natural causes, in which case the shortage is a mere change in condition, and the net amount of bounty paid upon the whole exportation must be the measure of the additional duty. To avoid this, the importer, they say, must assume the burden of showing that such shortage is due to other than what they denominate "natural causes."

All this is pure assumption, unjustified by the language of the section, or by any fair inference from the section as a whole or from anything contained therein. The act of Congress in the section referred to, says nothing about change of condition from "natural causes," makes no discrimination between shortage or diminution in weight resulting from such natural causes, and that resulting from perils of the sea, and of course gives no definition or explanation of what is meant by "natural causes." Indeed, neither the appraisers themselves nor the court below gives such definition. However much it may be believed that Congress meant all this, it certainly has not said it. The caution implied in the phrase "Voluit sed non dixit," is as applicable to the interpretation of legislative acts as to that of testamentary acts. If a change was to be made as to the theretofore usual basis of customs duties, plain, explicit and appropriate language for that purpose should, and we are bound to presume would, have been employed by the legislative branch of the government. It is not for courts to extend the scope and meaning of a statute beyond what is determined by its express language, even if the purpose be to harmonize it with an intention of the Legislature enacting it. To do so, would be judicial legislation.

It is a well-settled canon of statutory interpretation, that tax laws must be clear and unequivocal in the language, by which a tax burden is imposed upon the citizen, and all doubts in regard thereto must be resolved in favor of the taxable.

In view of what we have said, it will be unnecessary to consider the proposition made by the appellant, that the loss in weight in this importation was, as a matter of fact, due to the actual destruction of sugar on the voyage to the United States, caused by the perils of the sea, so that even on the construction of the statute adopted by the court below, the extra duty in the present case is only payable on the landed weights. It should, nevertheless, be said, that it abundantly appears from the record, that the steamship "Pilgrim," carrying this cargo of sugar, was subjected to unusual stress of weather in her voyage from Hamburg to this country. She sailed on the 6th of January from Hamburg, and reached Philadelphia on February 26th, a voyage of 53 days instead of one of 10 or 12 days, which would have been the case under normal conditions. Grounding several times be-

fore she reached the sea, which caused leaks and strains and necessitated sundry repairs, she was afterwards exposed to storms of unusual violence and duration, which caused further leaks, from which it was found that the sugar had been badly damaged and much of it destroyed. We cannot agree, therefore, with the court below that there was no sufficient evidence to show how there came to be a shortage in the sugar exported.

We think, however, that the express language of section 5 of the revenue act of July 24, 1897, requires that the additional duty imposed by said act, should be measured by the export bounty paid upon the weight of sugar actually imported into this country, as found by the official weigher at the port of Philadelphia, and upon which the regular duties were assessed; and that it is immaterial from what causes the deficiency, if any there be, results.

The decree of the court below is therefore reversed and the record remanded, with directions to enter a decree in conformity with this opinion.