**PARAMOUNT FILM DISTRIBUTING CORPORATION, et al.,**

v.

**Joe APPLEBAUM, et al.**

No. 14634.

United States Court of Appeals
Fifth Circuit.

Oct. 12, 1954.

Rehearing Denied Dec. 20, 1954.

Everett, Jr., Vicksburg, Miss., and Meyer H. Lavenstein, New York City, W. C. Wells, III, Jackson, Miss., for Twentieth Century-Fox Film Corp., Warner Bros. Pictures Distributing Corp., United Artists Corp., Columbia Pictures Corporation, Republic Pictures Corp., Loew's Incorporated and Universal Film Exchanges, Inc.

Landman Teller, Vicksburg, Miss., Jerome S. Hafter, Greenville, Miss., and Walter P. Armstrong, Jr., Armstrong, McCadden, Allen, Braden & Goodman, Memphis, Tenn., Wynn, Hafter, Lake & Tindall, Greenville, Miss., Teller & Biederharn, Vicksburg, Miss., for appellees.

Before BORAH and RUSSELL, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

Appellants are Columbia Pictures Corporation, Loew's Incorporated, Republic Pictures Corporation, Twentieth Century-Fox Film Corporation, United Artists Corporation, Universal Film Exchanges, Inc., and Warner Brothers Pictures Distributing Corporation, distributors of motion pictures,[1] and Paramount Gulf Theatres, Inc., an exhibitor.[2] They appeal from a judgment against them in the amount of $450,000 treble damages and $40,000 attorneys' fees.

Appellees Joe Applebaum and Bertram E. Simms, as partners in the ownership and operation of the Center Motion Picture Theatre, sued the corporate appellants along with Clyde G. Darden and W. A. Prewitt, Jr., owners and operators of the Lake Theatre, charging a common conspiracy to monopolize the motion picture business in Greenville, Mississippi, and to restrain trade in the distribution of films, all in alleged violation of the Sherman and Clayton Anti-Trust Acts.[3] Specifically, it was alleged, inter alia,

Gibbons Burke, New Orleans, La., Earl T. Thomas, Jackson, Miss., Frank E.

1. When it is necessary to refer to these appellants individually, they will be called respectively: Columbia, Loew's, Paramount Distributing, Republic, Fox, United Artists, Universal and Warner. Collectively, this group will be referred to as the distributors.

2. Hereinafter called Paramount Gulf.

3. 26 Stat. 209, 38 Stat. 730, 737, 15 U.S. C.A. §§ 1, 2 and 15.

that appellees had built an amusement center on the outskirts of Greenville, including the Center Theatre, which they opened February 9, 1947; that at the time three other theatres were operating in Greenville, Paramount and Delta (by Paramount Gulf) and the Lake (by Darden and Prewitt), all of which were in downtown Greenville; that Paramount was the largest but when built Center was larger and more modern than either Delta or Lake; further that all defendants joined immediately in a conspiracy to restrict first-run and second-run films to the exhibitor defendants, to deny them to Center, and to grant unreasonable clearance rights over Center, thereby forcing the latter to close and damaging complainants to the extent of $200,000. They prayed for treble damages of $600,-000 and trial by jury.

The case was tried intermittently over a period of approximately seven months, with a record of some 5,996 pages in 21 volumes. Defendants moved for a directed verdict at the end of plaintiffs' case, but the Court reserved ruling until the evidence was completed. Similar motions at the end of the evidence were denied, as were motions for judgment notwithstanding the verdict and in the alternative for a new trial.

A claim against RKO was compromised during the trial for the sum of $10,000 and there was a verdict and judgment for defendants Darden and Prewitt, doing business as Lake Theatre.

Counsel for appellants[4] state the issues on this appeal as follows:

"First: Whether there was any substantial evidence of a conspiracy by each appellant with each and every other appellant to deprive plaintiffs of motion pictures for first run in Greenville.

"Second: Whether there was any substantial evidence that plaintiffs were injured in their business or property as a direct and proximate result of the aforesaid conspiracy."

The motions for a new trial (on which testimony was taken) (R. 5783, 5941) raised the following additional questions:

"Third: Whether the trial court erred in giving certain instructions and refusing certain instructions requested by the defendants. (All defendants duly objected to the court's action.)

"Fourth: Whether the verdict of the jury acquitting the Lake and holding appellants liable necessitates a new trial, not only with respect to Loew's, Universal and Columbia, but also with respect to the remaining appellants.

"Fifth: Whether the prejudicial and extraneous influences on, and information acquired by, the jury required that there be a new trial."

For the purposes of this decision, these points may be considered under three general headings: (1) failure to direct a verdict for defendants; (2) erroneous charges generally and undue emphasis in dealing with the special requests of plaintiffs as compared to those of appellants by the trial court; and (3) the overruling of a motion for a new trial, which, in addition to alleging insufficiency of the proof, charged misconduct of the jury, information as to the settlement with RKO and rumors of offers of compromise by the other defendants gotten to it during the trial. These will be taken up in reverse order, since what we have to say about the third will have an important bearing on the other two.

### I. The Jury

The trial began on January 30th and ended on September 1st, 1951. It was conducted in an atmosphere undoubtedly friendly to the plaintiffs, as against the non-resident corporations. Most of the latter had been involved as defendants in the well known, nationwide suit by the Government, U. S. v. Paramount Pictures, Inc., tried in the first instance by a statutory three-judge court in 1946,

---

**4.** Republic presented also a separate argument, and its position will be dealt with later.

D.C., 66 F.Supp. 323, without a jury, and, on appeal, affirmed on the conspiracy and monopoly counts by the Supreme Court of the United States in 1948, same title, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, in which the defendants therein were found guilty of violating, in many respects, the same statutes, relied on here, particularly sections 1 and 2 of the Sherman Anti-Trust Act.

The framers of the Federal Constitution believed that citizens of states other than that of plaintiffs would have a better chance of fair treatment in the National Courts, where judges are appointed for life or during good behavior, and were therefore presumably as free from partisanship as was humanly possible to make them. These considerations, combined with the control of the judges in the examination as to qualifications of jurors, their power to comment on the evidence and to advise the jury in the charge as to the relationship of the facts and the law, unquestionably create a situation, especially where a highly penal statute, as in this case, is involved, requiring him to exercise a high degree of care and diligence to see that nothing is done that may add the weight of his position to the inescapable advantage of the local citizen, in trying the case before a jury chosen from the community in which the latter lives and to whom he is usually known.

█▌ In a protracted trial such as this, with the jurors left free to go and come when not hearing the case, the opportunities to see and evaluate the local litigant as against the large and "soulless" foreign corporation, often produces a favorable attitude toward the complainant, in a damage suit, notwithstanding the honesty and integrity of those performing the important duty of determining the weight of the evidence and the consequent rights of the parties litigant. We who have had long experience with such matters recognize this as one of the weak links in the jury system, although we cherish that system as one of the great pillars in the structure of our free institutions. The ordinary layman, taken from the private walks of life, may have a sincere desire to do justice between his fellow men; but he is usually a complete stranger to the intricacies of legal problems, and every safeguard possible should be observed to see, first, that he allows nothing but the sworn testimony to influence his decision, and second, that no outside considerations are thrown into the balance to divert his attention from the testimony, in making up his mind. He has to be told that he is the sole judge of the weight of the evidence and the credibility of the witnesses, and that he has the high privilege, in event of conflict, to determine which he will accept. In a case of this kind, if the jury finds that the plaintiff is entitled to recover at all, the statute permits the trebling of the amount as a penalty, and to that extent, it partakes of the nature of a criminal charge, for which reason, it would seem, the proof should be stronger than in an ordinary civil action.[5] Hence, the trial court should impress upon the jury as clearly as possible the meaning of the phrase "preponderance of the evidence."

██▌ In view of what has thus been said, it is highly necessary that no outside influence or circumstances should be thrown into the scale to induce a conclusion which otherwise might not be reached. We therefore find it essential to carefully review the record as to the conduct of the jury and such outside matters as could have influenced their verdict, notwithstanding the very thorough consideration which they received at the hands of the lower court. The solution of this question does not require a positive finding that the jury was actually influenced by what took place; but rather involves a determination as to whether

**5.** Harrison v. Vose, 9 How. 372, 50 U.S. 372, 13 L.Ed. 179; Hatfried, Inc., v. Commissioner, 3 Cir., 162 F.2d 628; General Ice Cream Corp. v. Benson, D.C., 113 F. Supp. 107; Landry v. Mutual Life Ins. Co., D.C., 56 F.Supp. 156; Madison v. Prudential Ins. Co., 190 La. 103, 181 So. 871.

or not it was made reasonably certain that they were not. See Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917; McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300; Southern Pacific Co. v. Klinge, 10 Cir., 65 F. 2d 85; Bateman v. Donovan, 9 Cir., 131 F.2d 759; Wheaton v. United States, 8 Cir., 133 F.2d 522; Jorgensen v. York Ice & Machinery Corp., 2 Cir., 160 F.2d 432; Liggett & Myers Tobacco Co. v. Imbraguglia, D.C., 73 F.Supp. 909. As stated, the court below reviewed the many incidents complained of, and although being in doubt as to whether the jurors could lawfully be interrogated as to the effect, if any, those incidents may have had upon the verdict, yet he permitted it and found affirmatively that they had none. An appellate court is always reluctant to disagree with the trial judge in such matters, yet it has the duty to see that there is no miscarriage of justice.

We quote in the footnote from the court's analysis and conclusions.[6]

6. "As heretofore stated, in order to determine whether the matter was prejudicial it is necessary to read the entire record of the testimony on the motion for a new trial, which begins with the testimony of Guido at page 38 thereof. I have read this entire testimony and think conclusively that the testimony of Guido shows he was not influenced by the extraneous matter, and before going further with this I will make a finding of fact because of some conflicts in the testimony:

"I find as a fact that while he was a member of the jury, and before the case was submitted to the jury for consideration, that one juror stated in the hearing of Guido that the companies wanted to compromise the case for $100,000.00. Guido asked: 'Where did you get your authority for that?' The juror replied: 'I got it from good authority.' This statement was made in the corridor or hallway off the courtroom and outside of the jury room. There were other jurors standing around at the time, but Guido does not know whether it was heard by them. The juror who made the statement was telling it to Guido. On another occasion when Guido was playing dominoes at a smokehouse an outsider made a remark in Guido's hearing that they had tried to compromise the case for $100,-000.00 and it was turned down. That person was not a member of the jury. On another occasion, when Guido was driving by the Vicksburg Hotel a man by the name of Freedman waved at him and he stopped. Freedman asked Guido if he was on the jury and Guido replied that he was. Thereupon Freedman said: 'Well, if you can take care of my friend Applebaum I will appreciate it.' Guido stopped him immediately and said: 'I don't want to discuss this case. I am on the jury all right.' Freedman replied: 'Well, maybe it will be worth while to you.' Guido replied: 'You are talking to the wrong man.' Freedman said, 'How is the case going to come out?' Guido replied, 'I don't know anything about it', and drove off. That was two or three months before the case ended. Guido did not even tell anybody about it. In the jury room, after the case was submitted, not a word was said about either of these occurrences, nor did Guido at any time report the occurrences to the court or any officer.

"Juror Liddell is a plumber and was a member of this jury. He made two trips to Greenville, Mississippi while the Center Theatre case was being tried, where this theater is located. The first trip was to attend the wedding of his brother-in-law, and his wife and daughter and a friend accompanied him on this trip, which was about June 23. His brother-in-law is Ben C. Penn, Jr., who is the legally adopted son of Ben C. Penn, Sr., who testified as a witness for the plaintiffs in this case. He went up on Saturday and returned on Sunday, and stayed in the home of his father-in-law. On his way there or back he saw the Center Theater, as it was on the highway he was required to travel. He made another trip in August, with his family, to visit his wife's parents, as she was expecting to give birth to a child in the near future and desired to have this visit with her family. He testified that on neither of the occasions did he discuss the lawsuit with Mr. Penn, Sr., nor did he know that Mr. Penn, Sr. was going to be a witness in the lawsuit until he walked to the witness chair. He had been considering going into business with his father-in-law in Greenville for some two or three years and still had that under consideration; that Mr. Penn, Sr. knew he was a member of the jury and learned this in the Spring and learned this while on a visit to the home of the juror at Natchez, when they had come to talk over the wedding plans of Penn, Jr. and they were accompanied by his fiancee. He saw the

The Court found that other than Guido, Rockwood and Delaughter, none of the jurors heard anything about the settlement with RKO and rumored offers to compromise by the other defendants for $75,000 or $100,000 until after the trial, as disclosed by the testimony of the remaining nine.

There was also another incident which happened in the Courtroom during the trial on July 10, 1951, in which plaintiff Applebaum winked at Juror Rockwood and the latter smiled back. This was noticed by the court itself, the jury was dismissed for the day and the court recited what happened, as appears in the footnote.[7] All defendants at the time moved for a mistrial, which was denied.

We now proceed to review for ourselves the testimony as to the alleged misconduct, efforts of persons outside, and reports of offers by defendants to compromise which reached at least some of the jury during the trial, as alleged in

other picture shows located in Greenville as he could not miss seeing them in driving through the main parts of town. He heard nothing in the jury room to the effect that $100,000.00 had been offered in compromise and did not learn of that until after the trial.

"William Rockwood was a member of the jury and during the progress of the case, and before the jury retired for consideration of their verdict, he heard a discussion or received information that an offer of $75,000.00 in compromise had been made. This happened in a cafeteria. He had gotten his tray in the crowded cafeteria and saw a booth where two men were sitting and he asked if he could sit there. They replied, 'Certainly'. He put his tray down and began to eat his dinner. No conversation was addressed to him, but one of the men in his hearing asked the other fellow what he was doing down there and this man replied: 'I'm down on the picture show trial', and said, 'It must be a mighty big case, I hear they offered to compromise for $75,000.00'. This party further stated that he had brought some witnesses down from Greenville for the case. This was in July or August. He ate his lunch and left immediately. He did not tell Guido or anyone else about what he had heard. During the progress of the trial he heard a discussion among some of the jurors that there was an offer of $75,-000.00. He understood it to be said that the defendants had offered to pay $75,000.00.

"T. J. Delaughter was a member of the jury and received or had information that one of the parties in the case had settled or compromised, having heard this in the hall, off from the court room. He said that Juror Liddell had stated that he understood the Columbia Corporation had paid off. Being asked how he knew, he said, 'A little bird told me.' Being asked, 'Do you know it to be a fact?' He said, 'I have heard it.' As he re-membered, he had heard that $10,000 had been paid. He heard some discussion in the jury room and some member said it was RKO that was out instead of Columbia. He further testified that he did not remember who said it, but it was reported to them after they had retired: 'You had better settle this because the judge is going home at 11 o'clock. He is going to leave here and he won't be back before Tuesday and we will have to lay over here until the judge comes back.' That was said several times and finally it was said: 'Let's decide this thing. We don't want to stay here until Tuesday morning.' " (R. 5950-5953)

7. "The Court: During the early cross examination by Mr. Green of this witness, the court noticed Mr. Applebaum smile and wink at the second juror distant from me, further distant from me on the front row, and the juror pleasantly smiled back. At the beginning of this trial, when I let the jury separate, I instructed the jury to remain together as far as possible, but during the recess hours to get to the end of the hall, the purpose being there should be no social contact. At this time I will not declare a mistrial, but I want to say to Mr. Applebaum that if I see that occur again, I am going to punish him very severely. I don't know what course I would take with reference to the entry of a mistrial; I am of the opinion at this time that no serious damage was done by this conduct, but it was improper and is calculated to have an effect upon the verdict of this case, and I wanted the record to show from what I observed because it was very definitely done, and I wanted to explain to the plaintiff, Mr. Applebaum, that that will not be permitted. 1 do not impute to him at this time any direct purpose of influencing the jury, but it is calculated toward a possibility of that effect; so, I just don't want it to occur again." (R. 3673)

the motion for a new trial. As stated earlier, the court allowed each side to present anything within its knowledge bearing upon these charges, including exhaustive and unrestricted examination of the jurors themselves. It was taken up on October 23rd following the verdict on September 1st, 1951. The first twenty pages in the record on the hearing of this motion, were consumed with objections to the use of jurors as witnesses, arguments, colloquies between the court and counsel, including the statement by those for plaintiffs that defendants had employed private detectives to investigate the charges of misconduct by the jury and who had made written reports. This was followed by a demand that they be furnished to plaintiffs' counsel before proceeding with the hearing. Counsel for defendants stated they did not have reports present but the court directed them to telephone their offices in New Orleans to send them up so opposing counsel might see them.

When the first witness was called, and before his testimony began, the Court interrupted to say with respect to objections by counsel for plaintiff, as quoted in the footnote.[8]

Juror Guido: After developing the fact that the witness had been a juror in the case who lived at Vicksburg where it was tried, counsel for defendants asked and the witness answered questions, among others, as follows:

"Q. Mr. Guido, while you were a member of the jury and sitting on the jury, and before the case was submitted to the jury for consideration, did at any time there come to you information concerning a compromise of this case? A. Well, one thing I heard—there was one juror among the jury, I don't know which one it was.

"Q. I just want the facts. A. He said the companies wanted to compromise it for $100,000.00. I

said, 'Where did you get your authority for that?' He said, 'I got it from good authority.' I didn't pay any attention to that."

\* \* \* \* \* \*

"Q. That was stated to you on the jury? A. No, on the outside. You know, in talking.

"Q. That was in the corridor? A. Yes, sir.

"Q. *And the juror who made that statement to you was whom?* A. *I couldn't tell you. That has been six or seven months ago.*

"Q. *You know it was a member of the jury?* A. *Yes, I know it was a member of the jury, but I don't know where he got the information.*

"Q. *Do you know what was stated to you as to the fact that he had it on good authority?* A. *That is what he said. I don't know.*

"Q. *The statement was definitely made to you?* A. *Not made to me. Well, I guess it was made to me, too, and I guess he told somebody else that.*

"Q. *There were several jurors standing around?* A. *I know they were close. I don't know whether they heard it or not.*

"Q. His remarks were being addressed to the ones who were standing around? A. *He was telling me about it. I don't know if the other fellows heard it or not."*

\* \* \* \* \* \*

"Q. Now then, on another occasion while you were still on the jury in this case and prior to the time the case was submitted to the jury, in the Central Smoke House did you hear anything concerning a compromise in this lawsuit? A. Well, I was there one evening—that was two or three months before the case was over. I think it was during a recess. I was playing dominoes—well,

---

8. "The Court: Mr. Armstrong, I think all of your objections are well taken care of, so far as the record is concerned. If anything develops on the trial that you think your objection doesn't cover, you are at liberty to raise further objections." (R. 5783)

I don't know whether I was playing or not—there are so many tables around there—it was a distance from here to maybe Mr. Thomas.

"Q. *How far is that,—ten or fifteen feet? A. I don't know. A fellow made a remark that he understood they tried to compromise the case for $100,000.00 and they turned it down. I don't know where he got the information.*

\* \* \* \* \* \*

"Q. *Did he make any statement as to where he got his information? A. I don't know if he did or not. I didn't pay any attention to it nohow.*

"Q. Was he a member of the jury? A. No, no."

\* \* \* \* \* \*

"Q. Was he playing dominoes? A. I don't remember. It has been so long ago. *I don't pay attention to those kind of things. I just forgot about it.*"

\* \* \* \* \* \*

"Q. *Do you recall who made the statement? A. Yes.*

"Q. *Who made it? A. A fellow by the name of Nasey Hirsch,—old man Hirsch's son, who used to be a lawyer.*"

\* \* \* \* \* \*

"Q. *And before the jury retired to consider the case, did anyone ever attempt to talk to you about this lawsuit? A. Well, one man, like I told you,—a fellow by the name of Freedman. I was driving by the Hotel Vicksburg and he waved at me and I stopped. He was talking to somebody but I forget who. He asked me if I was on the case. I told him I was. He said, 'Well, if you can—',—I don't know how he said it, but something like: 'If you can take care of my friend Applebaum, I will appreciate it.' I stopped him right away. I said, 'I don't want to discuss this case. I am on the jury all right.' He said, 'Well, maybe it will be worthwhile to you.' I said,*

*'You are talking to the wrong man.' He said, 'How is the case going to come out?' I said, 'I don't know anything about it.' And I drove off.*"

\* \* \* \* \* \*

"Q. That was sometime before the case ended? A. Yes, sir. That was two or three months. *I didn't pay attention to it. I didn't even tell anybody. I don't guess he meant anything.*" (R. 5784–5788) (Emphasis supplied.)

On cross examination, in the main, the witness reiterated what he had said on direct examination, *but admitted he had told juror Delaughter about the approach of Freedman*, because, as he stated, Delaughter had reminded him of it since the trial (R. 5794), whereas on direct examination he had said in regard to the Freedman incident, as appears above, "\* \* \* *I did not pay attention to it. I did not even tell anybody* \* \* \*." (R. 5793). It further appears that before the trial of the motion was taken up, counsel for the plaintiffs had assembled all of the jurors together at one time in a single room, read to them the charges in the motion for new trial, and had thoroughly interrogated them about those charges, with whatever effect, as compared to interviewing them separately, it might have on their testimony, when called to testify under oath. Of course they were not sworn on that occasion, yet we must assume they were human and subject to such natural resentments as might arise from an attack upon their verdict. They were at least permitted to know what each other would say when called by defendants' counsel, who apparently had no other means of making proof of the matters which they had charged except by the testimony of the jurors themselves. Strange to say counsel for appellants apparently followed a similar course. Freedman certainly could not be expected to admit that he had attempted to bribe one of these jurors.

Juror Liddell: Liddell was a plumber who lived in Natchez. During the trial

he visited in the home of his father-in-law, Ben C. Penn, Sr. at Greenville, (where all the theatres were located) who was a witness for plaintiff but which fact Liddell said was unknown to him at the time. On his visit to Greenville he passed and observed the surroundings of all three theatres. The first trip was made to attend the wedding of his brother-in-law on June 23rd and a second one was made in August following "the week-end before the week that the case was closed" after Penn, Sr. had testified. He stated the reason for the latter trip was that his wife wished to visit her parents shortly before an expected child was born. On the first trip Liddell discussed with his brother-in-law the possibility of joining the business of his father-in-law as agent for typewriter dealers but said nothing to Penn, Sr. about it then. However, on the second trip, shortly before the case was finished after he had seen Penn, Sr. on the witness stand, the two did discuss it. Penn, Sr. also visited Liddell in Natchez three times during the trial, two of which were after Liddell had learned that Penn was a witness for plaintiffs. While in Greenville on the second visit in August, Liddell went to the place of business of his father-in-law, which was right next door to the Lake Theatre, and he also rode around Greenville observing all of the theatres including Paramount, Delta and Lake, as well as their surroundings. He told some of the other jurors of the relationship with Penn, Sr., but got no permission for the second visit, nor did he report it to anyone in authority after learning that his father-in-law was a witness. At the time Liddell testified on the motion for new trial, he was still negotiating with his father-in-law in regard to the typewriter business, including the idea that Liddell might either join the agency at Greenville or have a separate one at Greenwood.

On cross examination, the court allowed Liddell to testify as to how the jurors stood when they first went out, that is, 11 for the plaintiffs and one doubtful but he did not state at the time who the doubtful one was. Further on in the cross examination he testified:

"Q. Do you recall whether or not after your first discussion, after the jury did indicate the vote or how they stood, whether or not Mr. Guido was first for the plaintiff or for the defendant, as best you remember? A. Well, I think, to the best of my recollection or remembrance, when we first went in his attitude was it was a bad business deal and he didn't know whether they should get anything or not, but it wasn't but two or three conversations when he said, 'Well, let's give them something.'" (R. 5819)

This was followed by the statement that he never heard anything of a compromise for $100,000 until the case ended.

"Q. *Was anything ever said in that jury room or said to you any time after your father-in-law became a witness, or that you heard either before or after you began the service as a juror, or up to the time the case was actually decided and your verdict rendered referring to any statement that had been made that there had been an offer by the defendants to the plaintiffs in the sum of $100,000.00? Or, in any other sum? A. The first I heard of that was after the case was closed and the verdict given. I believe Mr. Hafter told us about it in Mrs. Short's office.*" (R. 5819) (Emphasis supplied)

Juror Rockwood: Rockwood was a retired railroad man who lived in Vicksburg. His testimony is quoted in part as follows:

"Q. Now, Mr. Rockwood, during the progress of the case and before the jury retired for its consideration of the case, did you have any occasion to hear any discussion or receive any information about a compromise in this case? A. Well, as I stated before to you and to Mr. Teller, I was in the Jitney Jungle—

I ate over there quite a bit during the trial—I went through the cafeteria with my tray and was sitting in the booth that holds four and there were two gentlemen there. I said, 'Can I sit here?' They said, 'Certainly'. I set my tray down and proceeded to eat. One of them said to the other, 'What are you doing down here?' And he said, 'I am down here on that damn picture show trial.' The other one said, 'What is it?', and he said, 'Haven't you read about it?' I don't remember whether he had or not, but he said, 'It must be a mighty big case, I hear they offered to compromise for $75,000.00.' And that is all I heard. By that time some lady came to the other side of the booth and I finished before the two gentlemen and the lady did.

"Q. Did anybody say anything about bringing some witnesses down? A. He said he had to bring some witnesses for the picture show case.

"Q. From where? A. He said from Greenville. That was, I figure, about three weeks after Mr. Thomas came back from his operation,—two or three. That must have been in August,—July or August." (R. 5823–5824)

On cross examination the witness stated he never mentioned hearing the above statement to any of the jurors, *nor was anything else said about a compromise.* We quote from further cross examination:

"Q. *Had you ever heard—other than what you have just told the Judge, which transpired in your presence under the circumstances which you have related—anything said about any kind of settlement being offered? A. No, sir.*

"Q. *Did you ever hear any member of the jury discuss any such thing? A. No, sir, I did not.*

"Q. *Did you tell this to Mr. Guido or anyone else—I mean what you* heard about the $75,000.00 settlement? A. No, I did not.

"Q. *Did anyone else tell Mr. Guido or any of the other members of the jury in your presence anything about a settlement being offered by the defendants or by the plaintiffs or anybody else? A. No, sir, I hadn't heard of it and didn't hear it in the jury room."* (R. 5828–5829) (Emphasis supplied.)

The Court again allowed counsel for plaintiffs to question the witness fully on cross-examination as to how the jury stood when it went out and as to how the verdict was reached. He was further permitted to testify about a conversation with juror Guido after the trial:

"Q. Were any of them for the defendants at all on the first ballot at the outset? A. I believe there was one for the defendants, or maybe two. Q. Do you recall who those two were,—as best you can recall? A. *I think it was Mr. Delaughter, and Mike Guido.*

"Q. After you gentlemen of the jury discussed your conclusions on the testimony, did you all finally get together? A. We finally did.

"Q. Both of them came over to your viewpoint that the majority of ten originally entertained? A. That is right." (R. 5829–5830) (Emphasis supplied.)

He was then further interrogated on re-direct about a conversation with Mr. Burke, one of plaintiffs' counsel and admitted he had said something about "sandhouse gossip" about an offer of compromise for $75,000.00 but denied he had ever reported what he had heard at the cafeteria to the jury or that it was discussed in the jury room. Then on recross examination, he gave the following testimony:

"Q. *Did you say you heard that among the jurors, the discussion about the statement? I don't know what you mean by sandhouse gossip. Did anybody say anything about it?*

A. *I heard some of them say there was an offer of $75,000.00.*

"Q. *That was during the trial?* A. *Yes, sir.*

"Q. *By the jurors?* A. *Yes, sir.*

"Q. Do you remember who it was? A. No, I don't.

"Q. *Was that before or after you heard the discussion at Jitney Jungle?* A. *I don't remember whether it was before or after I heard it in Jitney.*

"Q. *Do you remember whether that was among the members of the panel?* A. *Yes, sir.*

"Q. Do you recall who, if anyone, did so discuss it? A. No, I don't.

"Q. Did you ever tell anybody? A. No, I did not. The only one I was close with was Mr. Clark. I picked him up every day, and I don't remember having told him a thing in the world about it. Q. Do you know anybody else that told Mr. Clark? A. No, I don't.

"Q. *You said that was not discussed among the jury and if you hadn't heard the conversation you wouldn't have heard anything about the statement?* A. *That is the first I heard of it.*

"Q. *Did you hear anything after? A. I heard later on among the jurors that they heard there was a compromise offer of $75,000.00. There would be three or four standing in the hall gossiping and that was the extent of it.*

"Q. *Do you know if they said the plaintiffs offered to take $75,000.00 or the defendants offered to pay it?* A. *The defendants offered to pay it.*

"Q. Is that what the fellow said in Jitney-Jungle? A. He didn't say who. He heard that they offered to pay $75,000.00." (R. 5832–5834) (Emphasis supplied. Compare this with his testimony on cross examination earlier above.)

Juror Delaughter: Juror Delaughter lived at Hermanville, southeast of Vicksburg, and traveled back and forth part of the time during the trial with jurors Ball, Marsh and Liddell. He testified as follows:

"Q. *Now, Mr. Delaughter, during the progress of this trial and before the case was concluded, did you receive any knowledge or information concerning the fact that one of the parties in this case had settled or compromised the case?* A. *Yes, sir.*

"Q. *Now, state what that was and how and when you received that information?* A. *Well, it was in the hall.*

"Q. Which building? A. This building—right out there. When we were in the hall during recess or sometime when we were excused. **Mr. Liddell** *and myself were discussing the case as usual and he made the remark. Now, I have to tell you this so you can tell why this came up. I had said that I couldn't see where they had made a case of it yet. I believe that was the words that probably was said before that, and when we went out* he said, 'Well, what you going to say now?'

"Q. *Who said that?* A. *Mr. Liddell.* '—*The Columbia Corporation have paid off.' I said, 'How do you know that they have?' He said, 'Well, a little bird told me.' I said, 'Do you know it to be a fact?' 'Well', he says, 'I have heard it.'*

(Compare this with Liddell's denial above. [P. 5819 of the record.])

"Q. *Was any figure mentioned that you recall?* A. *It seems to me, if I recollect, that he said $10,000. I believe that was said.*

"Q. Now, was there any further conversation by you or any others of the jury concerning whether that was Columbia or some other party

in the suit? A. Not at that time, no, sir.

"Q. Was there any later conversation as to who it was? A. Not as I recall any special time that that was discussed.

"Q. *Was it ever said that it was RKO instead of Columbia?* A. *Well, after we went in the jury room this was mentioned, that instead of that being Columbia—or probably before—when we were told by the Court that RKO was out of it. Then someone—I don't remember how it was said, but someone said it was RKO instead of Columbia that paid off.*"

\*     \*     \*     \*     \*     \*

"Q. *During the course of the trial did you ever hear of any member of the jury having been approached by someone on the outside concerning the case?* A. *Yes, sir.*

"Q. *Who?* A. *Mike Guido told me some fellow approached him.*"

\*     \*     \*     \*     \*     \*

"Q. He did state that to you? A. One evening going home. We were going down the hall and *he and I were behind and he told me some man approached him and told him he could make some money or something to that effect. He said, 'Anybody said anything to you?' I said, 'No.' He said, 'I told them they weren't talking to me.' That was as near as I can get to it.*

"Q. Now, Mr. Delaughter, I believe you received this case on the week end, or as the week end was approaching? A. Yes, sir, on Friday, I think.

"Q. And the verdict was brought in the next morning? A. Yes, sir.

"Q. That was on Labor Day week-end,—Labor Day, I believe, was on Monday? A. Yes, sir.

"Q. What, if anything, was said in the jury room about the adjournment of court on Saturday?"

\*     \*     \*     \*     \*     \*

"A. I don't remember who said it, but it was reported to us, 'You better settle this because the judge is going home at eleven o'clock. He is going to leave here and he won't get back before Tuesday and we will have to lay over here until the judge comes back.' That was brought into the jury room. I don't know exactly who said it. I don't believe I remember that, but it was said several times. It was said, 'Let's decide this thing. We don't want to stay here until Tuesday morning.'

"Q. *Before the time the case ever went to the jury there had been discussion by you, or efforts on the part of the jury to persuade you to their views?* A. *Oh, yes.*

"Q. *Starting that early?* A. *I don't remember just when it was.* **I do know this,—it was before Mr. Applebaum was dismissed as a witness that we began on a kind of discussion,—first one and then another arguing,—and it continued on until it was through, every day.**"
(This was before plaintiffs had finished their case.)

\*     \*     \*     \*     \*     \*

"Q. *You did mention that you had heard—I think you specifically said you heard from* **Mr. Liddell—** *that Columbia was out, having made a settlement?* A. **That is right.**
(Liddell was the juror who visited his father-in-law, a witness for plaintiffs, the second time just before the case ended, and this witness also visited Liddell at Natchez some three times during the trial.)

"Q. *Later on you figured it must have been RKO instead of Columbia?* A. *Yes, sir.*

"Q. *Do you know whether or not that was a conclusion that was deduced from what was seen or heard in the court room?* A. *I don't know, no, sir. I don't know just how that was learned. He didn't tell me that. He didn't say how he got it.*

"Q. *Did he say he had figured it out?* A. *No, sir, he didn't tell me. I believe,* **if I remember, he said a little bird told him,** *or something like that. I don't remember just exactly how he answered it.*

"Q. You later found out that that conclusion was erroneous? A. We later found out they were still in.

"Q. As you have already told us, you recall the fact that the court instructed you that RKO was not a party—maybe that fact influenced you one way or the other and entered into your consideration? A. That is right, he told us that."

\*    \*    \*    \*    \*    \*

"Q. *There was no basis for it that you know of other than some member of the jury expressed their opinion?* A. *It was said more than once, when it would reach the jury, and we began to think and we said, 'We hope we don't have to stay here until Tuesday, and somebody said, 'Are we going to spend Labor Day here?'*

"Q. They were talking to you,— you were the only one that hadn't agreed with them? A. That is right.

"Q. *At first, I believe it has been indicated that Mr. Guido and you both were not of the same mind as the other members of the jury?* A. *That is right.*

"Q. *The case was discussed and finally Mr. Guido decided to be for the plaintiffs and* **in an amount larger** *than was later returned?* A. *Yes, sir.* (Could this have any significance?)

"Q. And then you finally agreed on the verdict that was returned? A. I think probably that I had some influence because *they wanted to give, and would have given if I had agreed to it, the full amount.* But I believe I done that much. Most of them wanted to give the full amount asked for. We finally come to an agreement.

"Q. On the basis of the verdict that was returned? A. Yes, sir."

\*    \*    \*    \*    \*    \*

"Q. *I believe you mentioned that there had been efforts of persuasion on you even before you went to the jury room, is that right?* A. *Well, yes, trying to show me that I should see like they were seeing.*

"Q. *What was the nature of those discussions?* A. *It was just about the same thing all the time, over and over. When some testimony would come in, maybe we would discuss the testimony and I would say, 'I don't see anything in that.' They would continue to try to show me their side of it."* (R. 5834–5843) (Emphasis supplied.)

*Juror Blackman:* Counsel for plaintiffs, appellees, called the other jurors as witnesses, the first of whom was Bishop C. Blackman, from whose testimony the following is taken:

"Q. A motion has been filed in the court by the defendants in the case, which alleges certain acts of misconduct. Can you tell the court now whether you have read this motion, or has it been read to you? A. Yes, sir.

"Q. Can you tell the court whether or not there was any allegation therein which, so far as you know, was factually true? A. There was not." (R. 5841)

He also testified he had heard nothing about settlements or offers of compromise for any amount.

"Q. Did you, *while in Greenville,* discuss this case with anybody, witnesses or anybody else? A. I did not." (R. 5845–5846) (Emphasis supplied.)

In dealing with this witness, counsel for plaintiffs again asked the general question whether anything had happened to influence his verdict within his knowledge and he answered in the negative. A portion of the charges in the motion for a new trial were then read and the fact that all the jurors were together at

one time to hear these charges was confirmed by this witness.

*Juror Farr:* On direct examination Farr stated he had heard nothing about a compromise until the trial ended, but immediately thereafter he learned that RKO had settled. His examination was then continued by reading a part of the charges in the motion and asking if any of them were true, and he said they were not.

On cross examination he testified:

"Q. You know that Mr. Liddell went to Greenville? A. I heard him say he went to somebody's wedding.

"Q. His wife's brother's wedding? A. Yes, sir."

\*　\*　\*　\*　\*　\*

"Q. I am asking whether or not the jurors would have occasion to talk about things other than the case, the evidence in the case, out in the hall?

\*　\*　\*　\*　\*　\*

"A. Yes, sir."

\*　\*　\*　\*　\*　\*

"Q. *You didn't hear any rumor —some sandhouse gossip—between the other jurors about RKO getting out for $10,000?* A. *No, sir. I wondered about that myself, but I didn't mention it to anybody.* (R. 5856–5857) (Emphasis supplied.)

*Juror Ball:* Testified on direct:

"Q. *Tell the court whether or not while you were serving on this panel and serving as a juror in this case, anything ever came to your attention from the outside or from any of your fellow jurors regarding any settlement offer of any kind as having been made by the defendants to the plaintiffs?* A. *It did not. I didn't hear anything until after it was over with.*

"Q. When did you hear it? A. Well, after we had got through with the verdict.

"Q. You mean after you had come in with the rest of the jurors and your verdict had been read and you had been discharged by the court? A. That is right.

"Q. And then did you hear about it? A. Yes, sir.

"Q. *Do you remember who you heard about it from then?* A. *Yes, sir, Mr. Hafter. We asked him about it.*

"Q. *Do you remember why you asked him or what you asked him?* A. *Well, I had a lot on my mind about it and I just wanted to know if I was right in the reason I asked, because of that one lawyer dropping out and we were wondering why he dropped out, but we never did know until it was over with.*

"Q. *Do you remember what lawyer that was?* A. *I can't call his name. We called him 'The Yankee'.*" (R. 5862–5863) (Emphasis supplied.)

The rest of the direct examination was substantially similar to that of the preceding witness for appellees. On cross examination he testified:

"Q. Now, you spoke of the fact that after the jury came in with its verdict you did go into the Clerk's office. *You went directly from the court room to the Clerk's office, did you not?* A. Yes, sir.

"Q. To prove your attendance and to get on away from town and to get home? A. That is right.

"Q. *You hadn't talked with anyone between the court room and the Clerk's office about the thing, had you?* A. *No, sir.*

"Q. *Then who was it asked the question about RKO?* A. *Well, I don't remember who mentioned it first. I was interested in it when I got out.*

"Q. *You don't remember whether you asked the question or somebody else asked it?* A. *I don't remember whether I asked it or not, but there was a good many of us interested in it.*"

\*　\*　\*　\*　\*　\*

"Q. Why was that asked? A. Well, the reason why we wanted to know was because there was a lot in our minds about it. We were wondering when RKO had gotten out.

"Q. That had been discussed in the jury room? A. Well, we discussed it a little bit then and didn't nobody know. We were all wondering when they got out.

"Q. Was it talked there that they had paid off and gotten out? A. Well, I don't know that that came up or not. We all had in our mind something must have happened the reason they got out.

"Q. That is why you had in mind that they had paid off and got out of the case? A. We figured that was about the way it was.

"Q. Then when you went immediately from the court room to the Clerk's office that was one of the first things that you wanted to find out, whether that was true or not? A. I don't know whether it was the first thing or not. We wanted to find out before we left there.

"Q. And you did ask that question, or somebody asked that question in your presence to confirm that? A. It was asked.

"Q. That made you feel better about the verdict? A. Well, I imagine it did.

"Q. Now, as we talked about the matter down on your front porch I believe something was said about there being some other general talk about settlement of the case but that you didn't pay any attention to that. Do you remember that? A. There was a good bit of discussion about it, but I don't remember all of it.

"Q. That was during the time when we were in and around the corridor there, and while the case was going on? A. Yes, sir. It came up all along there when we had discussions about it among the jury. There wasn't no outsiders in it.

"Q. But that was discussed among you and there was some general talk and gossip to that effect that there had been some compromise or settlement offers made? A. I don't know about that. I don't recall hearing of any settlement.

"Q. But there was some talk along that line? A. It had no effect on me. It didn't have no effect on me what come up.

"Q. Did you hear the matter discussed among other jurors, in which you were not involved, but were discussions by other fellows? A. Not that I know of.

"Q. Would you say it did or didn't? A. Well, it was a lot of discussion going on all the time. It would be different bunches get together and discuss it. We wouldn't all be together."

\* \* \* \* \* \*

"Q. Let me ask you this. In your conference yesterday, when you met the attorneys and when the specifications were read by Mr. Armstrong, there were some who said they did have some knowledge about offers in compromise talk or settlement or knowing something about that?

\* \* \* \* \* \*

"A. I didn't know anything about it until yesterday. I hadn't heard anything about it.

"Q. Someone on the jury did recollect that they had heard of the compromise or settlement talk in the case, didn't they? A. Well, that is what came up in there yesterday. There is only one that I think said he heard it.

"Q. Who was that? A. Mike.

"Q. He is the only one? A. Yes, I think so. He is the one we had the biggest discussion with.

"Q. Mr. Rockwood didn't say anything? A. Well, he could have said something. I don't remember.

"Q. Don't you recall that he did say something? A. Well, I believe

*he did say something about hearing somebody say something one day, but he never did discuss it with any of the jurors.*

"Q. *Didn't Mr. Delaughter say something he had heard about it?* A. *Well, I believe he said Mike told him he had heard somebody say something.*" (R. 5865–5870) (Emphasis supplied.)

(The latter part of this testimony shows, as did that of some of the other jurors, a disposition to evade.)

*Juror Busby:* This juror heard nothing about a compromise nor did anything else happen during the trial to influence his opinion in the case against defendants. He testified:

"Q. At no time when you were a member of the panel and up to the time you returned a verdict and received your discharge did you hear anything about any settlement being offered by the defendants to plaintiffs? A. I never heard of no offer being made.

"Q. Did you, *during the progress of the trial, go to Greenville?* A. *Yes, sir, I went very frequently.* I have two daughters that live there. *I imagine I average going every two weeks.*

"Q. You have been doing that for how long? A. I will say four or five years."

\*    \*    \*    \*    \*    \*

"Q. I believe you have already told us that you never, during the progress of the trial, heard of any offer whatsoever by RKO or anybody else as to any settlement of the case by the defendants to the plaintiffs? A. *I never heard of any offer being made. There was a rumor among the jury some way, I don't know what it was, but they said that Columbia must have got out. Some way or other something was said. That was when the old gentlemen left and went back.*"

\*    \*    \*    \*    \*    \*

"Q. *You later on found out what?* A. *That Columbia came back in the picture.*

"Q. *That was one of the rumors among the jury itself and not from any outside sources?* A. *It was just in the jury, is the only place I heard it.*" (R. 5872–5873) (Emphasis supplied.)

On cross examination:

"Q. As I understood it, you told Mr. Teller there was a rumor among some of the other jurors that Columbia Pictures had gotten out? A. Yes, sir.

"Q. *Did you take part in that discussion or did you just hear some of the other jurors talk?* A. *I couldn't tell you. I might have said something. It was just talk.*" (R. 5875) (Emphasis supplied.)

*Juror Liddell:* Juror Liddell was recalled for plaintiffs and testified as follows:

"Q. We asked you to stay for a moment. Do you recall any conversation with Mr. Delaughter regarding your statement of your idea of the settlement by Columbia or RKO, or how it might have been? A. *Well, we brought up the question of what happened to Columbia and what they possibly might have done. I think two or three of us ate together every day and traveled together quite a bit. I believe Frolich is his name, but this lawyer came in at first and was hollering for a fair trial and made a lot of fuss about it and then disappeared and we didn't know what happened to him. I brought up the subject and said maybe they decided to quit and back off.*

"Q. *Do you remember Mr. Delaughter asking you how you knew and you said it was a little bird that told you?* A. *I don't remember about the little bird. That must have been something I got on my imagination.*

"Q. *You don't remember about the little bird?* A. *If there was a*

*little bird it was one I brought up myself.*

"Q. *It happened in your own head?* A. *Yes, sir.*

"Q. *You didn't get it from the outside?* A. *No, sir.*

"Q. *Did you later on find that Columbia was still on the case?* A. *Yes, we brought that up. Some of Columbia's witnesses were put on the stand and I said that couldn't be right.*

"Q. You found out your calculations were wrong? A. Yes, sir, my calculations were wrong that time." (R. 5877–5878) (Emphasis supplied.)

On cross examination:

"Q. *There was talk about Columbia getting out?* A. *There was some discussion as to what happened to them and there was always the possibility of them withdrawing from the case for some reason or other.*" (R. 5878) (Emphasis supplied.)

*Juror Clark:* Juror Clark testified generally that he did what he thought was right in the light of the evidence and so far as he knew, all the other jurors did likewise. He heard of no settlements or offers to compromise. There was no cross examination by appellants.

*Juror Hammett:* On direct examination this juror stated he had heard nothing about any compromise or offers to compromise during the trial but did hear about the RKO settlement after the case ended. Called again, he testified:

"Q. You mean after you had been discharged? A. After I had been discharged it was discussed only with one person, and I didn't do very much discussing of that. I saw Mike and he asked me if I heard anything. I said no, and he said, 'They have telephoned me that there is some rumor going around.' I said I didn't know anything about it. He said they had some FBI checking on it. The next thing Mr. Everett telephoned me. That is all I know about it. I didn't know anything about what he asked me." (R. 5881–5882.)

Otherwise, he knew nothing of anything that happened during the trial that affected him or any other juror in deciding the case except the evidence heard from the stand and the law given by the Court. There was no cross examination.

*Juror Bloom:* This juror testified substantially as did the others called by plaintiffs, appellees, that he heard and knew of nothing that affected his or the other jurors' judgment except the sworn testimony and charge of the court.

On cross examination:

"Q. *What was said, if anything, by members of the jury about Columbia getting out of the lawsuit?* A. *The only thing I heard was when this lawyer that first came there when the case first started, when he dropped out it was just a rumor that possibly Columbia had settled or something.*

"Q. *That was said?* A. *I don't know whether it was said. It was more or less indicated in our minds. I never heard it discussed.*

"Q. Did you hear other jurors say anything about that and did you take part in the discussion? A. *No, I just figured that was what happened. I didn't know nothing about it until the latter part of the case and then I found out that Columbia was still in it. I didn't know what had happened then.*

"Q. *You had heard others express the same thing—doubt whether Columbia was still in the case or not— about the same thing you were wondering about?* A. *I don't recall whether I heard them or not. I wouldn't say for sure that I heard anybody else say it. That was just in my mind. I figured they had because their lawyer had gone.*" (R. 5887–5888) (Emphasis supplied.)

*Juror Tingle:* This juror heard nothing about any settlement or offer to settle until after the trial. He replied to the questions about Guido's statement at a

meeting between all jurors and counsel for the plaintiffs substantially as had those preceding him. On cross examination, however, as to RKO getting out of the case, he testified:

"Q. *There was no talk or discussion about why Columbia or RKO got out of the case? A. There was some talk about why one lawyer from New York disappeared and we didn't know what went with him. That is all I heard.*"

\* \* \* \* \* \*

"Q. *The jury didn't consider the fact that they had gotten out of the case? A. I don't know.*

"Q. *You wouldn't say about that one way or the other? A. No, sir.*

"Q. *There was no talk when you all thought Columbia had gotten out and then later you found out it must have been RKO that got out? A. Not that I heard.*

"Q. *You didn't hear anything about that at all? A. No.*" (R. 5893–5894) (Emphasis supplied.)

*Sam Freedman:* Sam Freedman was called as a witness for plaintiffs on the motion for a new trial and was the same man named by Guido who tried to talk to him about the case during the trial and intimated it would be worth while for Guido to decide the case in Applebaum's favor. Freedman said he had gone to Vicksburg about 16 years before the trial, met Guido shortly thereafter, met the woman he afterwards married at about the same time, who was working as a cashier for Guido in a restaurant. He testified further:

"Q. Do you know the plaintiffs in this case, Mr. Joe Applebaum and Mr. Bert Simms? A. I do not know Mr. Simms, but I know Mr. Joe Applebaum.

"Q. How long have you known him? A. I have known Mr. Applebaum I will say about ten years."

\* \* \* \* \* \*

"Q. You had heard either then or sometime that Mr. Applebaum and Mr. Simms had this case that was being tried here? A. Yes, sir.

"Q. Did you hear it from him or had you known it elsewhere? A. I just heard that he was here for the trial, that is all.

"Q. *In playing dominoes with Mr. Guido had you found out and did you know that he was a member of the jury trying this case? A. Yes, I had heard that he was a member of the jury and that is all that was said.*"

\* \* \* \* \* \*

"Q. *Do you recall at any time talking with Mr. Guido, or it is said that you approached him, presumably in some wrongful way regarding this case. If you do recall talking to him, will you tell the court when and where that was—we want you to tell all of the details. A. I don't know what day it was, the day of the month or anything like that—I don't recall that—but Mr. Guido was stopped on Walnut Street, or walked out on Walnut Street, some way or other. I stopped and said, 'Mike, how is Joe Applebaum's case coming on?' He flared up at me momentarily and said, 'Don't you know that I am a sworn juror and I am not supposed to say anything at all about it?' I said, 'Mike, I am sorry that I even mentioned it.' And that was all that was said. I went on down to Morris Garage.*"

\* \* \* \* \* \*

"Q. Did you mean anything by that remark? A. I didn't mean anything by that remark. I had no intention of mixing in with jurors and so forth."

\* \* \* \* \* \*

"Q. *Did you play dominoes with him at the Smoke House, if you remember, after you saw him on that occasion when he was still on the jury? A. Yes, sir.*" (R. 5897–5901.) (Emphasis supplied.)

On cross examination the witness first stated he learned from Guido that he

was on the jury, *before* he met Applebaum when the latter came to Vicksburg for trial, but further on said he had seen Guido *after* running into Applebaum. The witness denied he had said anything like "it would be worthwhile for Guido for the verdict to be in favor of Applebaum". He testified that Sol Wolff was one of two people who bought the Center Building when it was sold; that Wolff's store in Hollandale, Mississippi, is next door to that of Mrs. Applebaum, the latter's place being known as The Vogue. The witness had visited both places on occasions, but had not seen Mrs. Applebaum for several years. (R. 5916.) He represented a Houston firm and had been selling in the Mississippi territory for them about two years before he testified. Although Mrs. Applebaum's store was in his territory, he had not attempted to sell them anything during the last two years. (R. 5918.)

Plaintiffs recalled Juror Rockwood, who stated that after talking with one of the attorneys for the plaintiffs, that if he had testified there was a discussion of the $75,000 reported offer of settlement in the jury room, he wanted to correct the same as he had heard it only in Jitney Jungle where he ate and not in the jury room.

At the end of the testimony of the jurors, the Court stated that he had given counsel permission to interview them to find out what they would testify to. There was no indication however that it should be done in the presence of all the jurors at the same time. The Court kept the case open for further evidence, including affidavits, stating that if there were objections he would hear the parties thereon.

The Court then made a statement as to the extent which he thought the testimony of the jurors at the interview could be considered and that was only for the purpose of impeaching Mike Guido. It withheld ruling on the testimony of the jurors as to what happened in the jury room until counsel could brief the point.

Subsequently, affidavits of Joe Applebaum (who had been injured and could not be present) and Darden Marsh were taken and filed on January 4, 1952. The former stated in substance that at no time did he discuss or attempt to discuss the case with any member of the jury, nor did he ask anyone else to do so; that he knew Sam Freedman and at one time saw him in Vicksburg during the trial, at which the case was mentioned, but that he never asked Freedman if he was acquainted with or to contact any juror trying the case.

Marsh swore that he was the extra juror and sat through the trial until the case was submitted to the regular jury when he was discharged, and that he heard nothing about any compromise or offer of compromise nor did anything else happen, as far as he knew, to influence the verdict of the jury, other than the evidence and the law given by the Court.

Instead of a formal opinion, the Court addressed a joint letter of considerable length to all counsel in the case, stating his findings of fact and conclusions of law, some of which have been quoted above, in which the evidence and the authorities were reviewed. The motion for a new trial was denied.

We think it appears rather conclusively from the testimony, portions of which are quoted above, mainly by members of the jury, that at least three not only received information that one of the defendants had settled with the plaintiffs but also discussed with each other reports that some defendants had offered to compromise for $75,000 in one instance and $100,000 in another. These three jurors were Guido, Rockwood and Delaughter. That portion of Guido's testimony quoted above clearly discloses that another juror, whose name he could not remember, said "the companies wanted to compromise it (the case) for $100,-000" and that this juror when asked "where you got your authority" stated, "I got it from good authority." However, Guido added: "I didn't pay attention to that." This took place in the hall and not in the jury room. He equivocated as to whether it was made to him, but said: "There were several jurors stand-

ing around * * * I know they were close. I do not know whether they heard it or not." He further stated that on another occasion in the Central Smoke House "I think it was during a recess * * * two or three months before the case was over * * * a fellow made a remark that he understood they (the defendants) tried to compromise the case for $100,000 and they (plaintiffs) turned it down. I don't know where he got his information."

It also appears that Juror Rockwood testified that he had heard a discussion in Jitney Jungle restaurant between two men, one of whom said he had brought witnesses down to the trial of this case from Greenville and that defendants had tried to settle for $75,000 which had been turned down. Rockwood further stated he had said nothing about it to anyone else, but on being pressed again on recross examination by plaintiffs' counsel, testified:

"Q. Did you say you heard that among the jurors * * *? A. I heard some of them say there was an offer of $75,000.

"Q. That was during the trial? A. Yes, sir.

"Q. And by the jurors? A. Yes, sir."

He could not remember whether it was before or after he had heard the discussion at Jitney Jungle but "it was among the members of the panel".

Further on, also while on cross examination by plaintiffs' counsel, this juror was asked specifically if it was not a fact that the $75,000 offer "was not discussed among the jury, and, if you hadn't heard the conversation (at Jitney Jungle), you wouldn't have heard anything about the statement?" Rockwood answered, "That is the first I heard of it." (Emphasis supplied.) This was followed by:

"Q. Did you hear anything after? A. I heard it later on among the jurors. We heard there was a compromise offer of $75,000.00. There would be three or four stand-

ing in the hall gossiping and that was the extent of it."

This juror was called again as a witness by plaintiffs as respondents on the motion for new trial and changed his testimony so as to eliminate everything but the Jitney Jungle incident by saying he had heard nothing about an offer of compromise anywhere else. Yet, the two statements are clearly in conflict in unmistakable detail and it is not possible to reconcile them by calling the first an honest mistake. It is more reasonable to conclude it was a deliberate attempt to conceal what really took place among the jury, along with similar incidents which came out in the testimony of jurors above.

Juror Delaughter stated emphatically that he had heard during the trial "that one of the parties * * * had settled or compromised the case * * *. It was in the hall of the court building when we were excused, * * *. *Mr. Liddell and I were discussing the remark when we went out. He said, 'Well, what are you going to say now?'"* (Emphasis supplied.) Liddell was another who denied hearing anything about a compromise.

As stated earlier, the conditions surrounding this case from its inception were such we are impressed that the jurors were favorably inclined toward plaintiffs. We believe this is evidenced by some of the testimony quoted above, even before hearing defendants had attempted to compromise, and it is hard to accept the conclusion that such reports did not strengthen that attitude in a manner prejudicial to the defendants. The court below allowed all of the jurors to testify that they were not influenced by these reports, and, to some extent at least, apparently based its finding upon their testimony that those who admitted hearing about them insisted they were not influenced thereby. We cannot accept this conclusion. Some of the jurors claimed they heard nothing of any settlement or offer of compromise, yet a careful reading of the whole testimony on the

motion, on both direct and cross examination, leaves a rather strong conviction that such matters *were* discussed among many, if not all, and that some of them felt quite a relief of conscience when they were finally discharged and hurried to inquire if it was a fact that RKO had settled. It is also indicated that some were using this argument with the two who were said to have been either for the defendants or undecided when they first went out to consider their verdict. There is some evidence above that this condition existed when the case was still with plaintiffs, and before Applebaum had finished his testimony. We feel therefore that the record as a whole justifies the conclusion these extraneous matters had a substantial influence, prejudicial to defendants, in producing the verdict in this case. For these reasons the lower court should have set the verdict aside and ordered a new trial. See Southern Pacific Co. v. Klinge, supra; Wheaton v. United States, supra; Jorgensen v. York Ice & Machinery Co., supra; Liggett & Myers Tobacco Co. v. Imbraguglia, supra.

It is significant that, although the jury found for the plaintiffs against all of the non-resident corporate distributors, as well as Paramount Gulf (who operated both Paramount and Delta Theatres) a subsidiary of Paramount Distributing, they exonerated the owners of Lake, who, both according to the allegations of the complaint and the proof, if any, were the beneficiaries of the alleged conspiracy and monopoly of first and second run pictures, especially the latter, and depositions of both partners of Lake, Darden and Prewitt, were used as admissions of adverse parties by the plaintiffs. The affected distributor appellants argue that this had the affect of acquitting those defendants of wrong-doing who had leased their pictures to Lake. However, since we do not pass upon the merits except as to Republic, it is unnecessary to discuss that phase of the case. While of course the jury had the power to find for or against any of the plaintiffs or defendants, still courts should not shut their eyes to circumstances such as this, where the local citizen was let out, at least when called upon to determine whether the proof of extraneous matters reasonably supports the conclusion that the verdict rendered was influenced thereby.

## II. Instructions

Appellants' first specific complaint against the Court's charge to the jury is leveled at Plaintiffs' Requested Instruction No. 1, which was the first special instruction given. It set forth appellees' theory of the case in great detail, taking up some ten pages of the printed record. Without lengthy quotation, it is sufficient to state that the instruction was written *by counsel for appellees in the nature of* argument. It stated, inter alia, that Center was in every respect equal or superior to any other theatre in Greenville; that the distributors controlled such a large proportion of films as to constitute a monopoly; that appellees were able and willing to pay rental for films equal to or higher than any other theatre; that defendants conspired among themselves to refuse appellees first and second runs and to grant unreasonable clearances to the other exhibitors; that the purpose of the conspiracy was to give appellees' competitors advantage over them; that the conspiracy included illegal "franchise agreements"; "master agreements" and "formula deals"; that distributors required appellees to pay higher rentals than other exhibitors and thereby forced them to charge high admission prices; that as a result of the acts and conspiracies appellees were forced out of business with considerable loss, proximately caused by the illegal conspiracies.

Appellants argue that this instruction, although given as "the theory of the plaintiffs", contained inferences drawn by appellees and comments on the evidence not supported by the record or directly contradicted; that it was argumentative; and that it unfairly emphasized appellees' case because of its length and manner of composition. Further they complain that the trial judge refused to grant their special instruction prepared and presented to set forth their

theory in an effort to offset "the terrible effect" of the one given for appellees.[9]

Appellees point out that prior to reading the instruction, and again at its close, the judge cautioned the jury that it was only appellees' theory and was not evidence or law, as well as repeating some nine or ten times in the body of the instruction, "it is further the theory of the plaintiffs * * *". They also contend that in the general instructions and in special instructions submitted by appellants, the judge amply covered appellants' theory.

In a proper case, a party may be entitled to have his theory submitted to the jury, when there is evidence to support it and a proper request therefor has been made. Stoll v. Loving, 6 Cir., 120 F. 805; Chicago & N. W. Ry. Co. v. Green, 8 Cir., 164 F.2d 55; Montgomery v. Virginia Stage Lines, 89 U.S.App.D.C. 213, 191 F.2d 770. However, such a charge should be judicial and not one-sided or argumentative; and when the judge instructs as to one party's theory, he should also instruct as to the other party's contentions. U. S. v. Messinger, 4 Cir., 68 F.2d 234; State Automobile Mut. Ins. Co. v. York, 4 Cir., 104 F.2d 730; Home Ins. Co. v. Consolidated Bus Lines, 4 Cir., 179 F.2d 768. As was said in Sperber v. Connecticut Mut. Life Ins. Co., 8 Cir., 140 F.2d 2, 5, the judge is not required "to state his recollection of the evidence with nice exactitude for both sides"; yet his position is such that he must use great care, and "'deductions and theories not warranted by the evidence should be studiously avoided.'" Quercia v. U. S., 289 U.S. 466, 53 S.Ct. 698, 699, 77 L.Ed. 1321.

It is true that the judge made preliminary and closing statements to the effect that the jury should not consider the special instructions as proof or law.[10] It is also true that in his general instructions and in several instructions requested by appellants, the judge gave to some extent summaries of appellants' contentions, commenting upon evidence favorable to the appellants. But nowhere in the charge do we find a detailed, comprehensive statement of appellants' theory comparable to the one given for appellees. We also note that this instruction was given at the very beginning of the charge, when the jury was fresh and doubtless more attentive than later; and it was immediately followed by Plaintiffs' Requested Instruction No. 2 which was an eight-page treatment of appellees' theory of the law and the evidence as to their damages.[11] Further, those portions dealing with appellants' theory are scattered through the lengthy charge. It would be simply unrealistic to say that the treatment accorded appellants' theory in the charge as a whole was substantially comparable to that given in Plaintiffs' Requested Instruction No. 1. We cannot escape the conclusion that the instruction

---

**9.** Record, p. 5642, #214.

**10.** "The first instruction I shall read to you *does not purport to state any law and, as a matter of fact, it does not state any law; nor does it state any fact, nor is it proof of any fact in the case.* It simply states the theory of the plaintiffs, and that instruction I have given so that you could have before you what the theory of the plaintiffs is, but, as above stated, *I am giving it to you simply as the theory of plaintiffs and it is not proof of anything, nor does it state any law."* (R. 5408) (Emphasis supplied.)

\* \* \* \* \*

"As I before told you, gentlemen, that instruction simply gives you the theory of the plaintiffs upon which they are claiming that they are entitled to recover, and is not proof of anything. On the other hand, later in these charges I will give you the theory of the defendants, which likewise will simply amount to their contention. In short, at this time, I will repeat that among other things, briefly, it is their contention that there was no conspiracy between any of them, that they were not acting in concert or combination or conspiracy, but that they were acting independently and upon a claim of theirs that they had a right to carry on their business as they did carry it on, and that it was their purpose to license their film to the theatre that would gross them the greatest amount of money." (R. 5417–5418)

**11.** Record, p. 5418.

complained of, written by partisan counsel in the nature of argument, but coming from the judge with the force of his position, must have more or less overwhelmed the jurors and no doubt indelibly stamped upon their minds impressions most favorable to appellees. Considering the circumstances under which the case was tried, we are doubtful if *any* subsequent instructions could have offset or balanced such impressions. Finding no comparable instructions which might possibly have had that effect, we reluctantly conclude that the trial judge erred not only in refusing appellants' counterinstruction, but in granting appellees' requested instruction in the form presented.

Appellants also complain specifically of Plaintiffs' Special Instruction No. 63[12] granted by the Court, as well as No. 55[13] and No. 56 of similar import. Number 63 reads: "In licensing their motion picture films for exhibition on an early run at Greenville, Mississippi, distributor defendants were under a *duty* before licensing those films to any motion picture theatre, to *offer every* other equally suitable motion picture theatre at the city of Greenville, Mississippi, an opportunity *to negotiate for and obtain* those motion picture films equal to and in all respects the same as the opportunity afforded any other exhibitor." (Emphasis supplied.)

The complaint is that the instructions are incorrect statements of law, conflicting with the basic right of a distributor to select its customers according to its own standards. Appellees seek to support the instruction upon the authority of Ball v. Paramount Pictures, 3 Cir., 176 F. 2d 426, stating that it was based upon the decree approved in that case.

Despite the multitude of decisions against film distributors, it is still the law that ordinarily a distributor has the right to license or refuse to license his film to any exhibitor, pursuant to his own reasoning, so long as he acts independently. The anti-trust laws qualify that right only to the extent that they prohibit contracts, combinations and *conspiracies, with another party,* which have the purpose or effect of monopolizing or restraining trade in motion picture films.[14] As has been said or implied in so many cases, no exhibitor has an absolute right to demand an exhibition license for the films of any distributor; any illegality consists not in the refusal of any one distributor to license an exhibitor but in his *conspiring* with one or more other persons to refuse such license.[15] The three instructions complained of in effect told the jury that every distributor of films *must as a matter of law* accept all equally suitable exhibitors as customers and *must* treat them all equally. Such a statement not only overlooks the peculiarities of the motion picture exhibiting business, but it also obviously conflicts with the settled law to the contrary. The language of the decree in Ball v. Paramount Pictures, supra, may have had the force of law in the controversy there presented, wherein a conspiracy had been found to exist; but it does not state the law governing a jury whose task it is to determine whether or not a conspiracy did exist. The question here is not whether there was a duty on the

12. Record, p. 5442.

13. Record, p. 5441.

14. 15 U.S.C.A. § 13(a). "Before the Sherman Act it was the law that a trader might reject the offer of a proposing buyer, for any reason that appealed to him; * * *. Neither the Sherman Act, nor any decision of the Supreme Court construing the same, nor the Clayton Act, has changed the law in this particular. We have not yet reached the stage where the selection of a trader's customers is made for him by the government." Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., 2 Cir., 227 F. 46, 49.

15. See, for example: Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Theatre Enterprises, Inc., v. Paramount Film Distributing Co., 346 U.S. 537, 74 S.Ct. 257; Fifth & Walnut, Inc., v. Loew's, Inc., 2 Cir., 176 F. 2d 587; Bordonaro Bros. Theatres v. Paramount Pictures, 2 Cir., 176 F.2d 594; Dipson Theatres v. Buffalo Theatres, 2 Cir., 190 F.2d 951.

part of the distributors to license their films to appellees, but whether their refusal to do so was the *result of* an illegal *conspiracy*. Clearly, then, the trial court erred in granting the three instructions requested by appellees.

Appellees, however, contend that in reading at least four special instructions requested by appellants the court repeatedly made it clear to the jury that the duty said to rest upon appellants did not abridge their right to select their customers so long as that selection was made lawfully.[16] And, they argue, the effect of the instructions must be determined in the light of the charge as a whole.

■ The four special instructions referred to by appellees did in fact tell the jurors that no duty rested upon appellants to license the Center if they acted independently. However, we cannot agree that their presentation made it clear that they superseded the three erroneous instructions previously given. The record reflects no reference, direct or otherwise, to the three erroneous instructions, anywhere in the entire charge. There is nothing from which the jurors would necessarily conclude that the judge was qualifying or otherwise correcting the misconception which obviously resulted from the previous erroneous instructions. The propositions presented are some forty pages apart in the printed record and are completely contradictory in substance. Rather than cure or clarify the error in the three previous instructions, the giving of the four instructions requested by appellants must have resulted in additional confusion in the minds of the jurors. Certainly it cannot be said as a matter of law that the giving of later contradictory charges correctly stating the law necessarily cures previous erroneous instructions. Where the error is so fundamental as that in the three instructions given upon appellees' request, it must appear that later instructions or the charge as a whole so clearly obliterated the error as to render it reasonably certain that no prejudice resulted. The four correct instructions given at appellants' request cannot be said to have had that effect.

■ Nor can we agree that the charge as a whole renders the errors inconsequential. In the first place, the charge was so long and contained so many special instructions drafted by partisan counsel that we are doubtful if it can be considered "as a whole". In addition, the special instructions so often repeated the same substance in different words[17] that the charge "as a whole" is confusing even to one trained in law. Moreover, there are some instances wherein the judge read special instructions as submitted and then added qualifying or explanatory remarks[18] which were contradictory to the substance of the instruction given. Under the circumstances of the trial as previously discussed, we reluctantly conclude that the charge as a whole was most confusing and did not clarify or remove the prejudicial effect of the erroneous instructions.

### III. Motions for Directed Verdict

A. As to Republic:

As previously indicated, appellant Republic made a separate contention in addition to those advanced by all appellants. It forcefully argues that whatever inferences might be permissible as to the other appellants, there is no evidence to support the verdict and judgment against it.

Essentially, plaintiffs' complaint charged that all defendants conspired to deprive them of first and second run films during the period of Center's op-

---

16. Record, pp. 5483–5484.

17. For example, No. 21 and No. 22, R. 5432; No. 27 & No. 28, R. 5434; No. 2, R. 5418 and No. 35, R. 5437 and No. 59, R. 5440.

18. For example, R. 5435; R. 5439; R. 5468–5469; R. 5486–5487; R. 5503; R. 5524.

eration—February 9 through October 11, 1947. The substance of plaintiffs' theory was that all defendants refused to license such films, that this refusal by each distributor was uniform with the action of all others and with knowledge of such uniformity and that the jury was therefore entitled to infer the refusal resulted from a conspiracy rather than from independent action.

Republic's executive vice-president testified that his company was unable to finance the licensing of its films separately as each was released, and that its practice was to license the exhibition of all films planned for production in a given season in one contract executed prior to the season.[19] He stated that all films to be produced for the 1946–1947 season, ending October or November 1947, were licensed to Paramount Gulf[20] for first and second runs at the Paramount and Delta in Greenville. This arrangement was made, according to the custom of the company, in October, 1946[21] before he had ever heard of plaintiffs[22] and several months prior to the completion and opening of the Center.

Both the executive vice-president[23] and the New Orleans branch manager[24] for Republic (who was a friend of Applebaum) admitted that the company received a letter from Applebaum dated January 8, 1947, asking for first and second runs on Republic films. But each testified that this was their first knowledge[25] that appellees were operating the Center and that they wrote to Applebaum to the effect that their first and second runs had already been licensed[26] to Paramount Gulf for that season. None of this testimony is contradicted, and it is clearly shown that Applebaum was offered many pictures from the two seasons ending October 1946. These he refused because they were not of the type he desired. We are unable to discover any similarity or uniformity between Republic's conduct toward appellees up to October or November, 1947, and that of the other appellants. Nor is there anything in the record to indicate on the part of Republic a "proclivity * * * to unlawful conduct" as was relied upon in Milgram v. Loew's, Inc., 3 Cir., 192 F.2d 579, 584.

We have previously pointed out that there was no unqualified duty on Republic (or any of the distributors) to offer or license any of its films to appellees. Certainly, then, the law did not require Republic to rescind its prior contract with Paramount Gulf and grant to appellees rights which it had already promised to others before it even knew of the Center's operation. The burden was upon plaintiffs to prove facts from which it could reasonably be inferred that Republic had *conspired* with one or more of the defendants to refuse to grant licenses to plaintiffs. Republic admitted that it refused to license, but showed that the refusal was based upon a pre-existing contract with another exhibitor. There is not even the vague "conscious parallelism" and "past proclivity toward unlawful conduct" from which a conspiracy can be inferred. We know of no authority which requires or allows an inference of conspiracy to be drawn from Republic's act in honoring its prior contract with Paramount Gulf.

It is not clearly shown that Republic refused to license any 1947–1948 films to plaintiffs, since it does not appear exactly when any licenses for these films were granted. Therefore, the record is barren of proof that Republic had any first or second runs available during the Center's existence. Even if we were to assume that licenses were granted for such films prior to the Center's closing on October 11, 1947, there is nothing in the record to show that appellees re-

19. Record, pp. 4491–4493.

20. Record, p. 4493.

21. Record, p. 4493.

22. Record, p. 4496.

23. Record, p. 4497.

24. Record, p. 4693.

25. Record, p. 4497; p. 4694.

26. Record, pp. 4696, 4697.

quested any of them, or that Republic conspired with anyone to refuse licenses to Center. Republic's branch manager testified that the last contact the company had with Applebaum was in March, 1947, and there is nothing in the record to contradict his statement. As was said in Milwaukee Towne Corp. v. Loew's, Inc., 7 Cir., 190 F.2d 561, at page 568:

"We know of no principle of law which authorizes a person aggrieved by the deprivation of a right either statutory or constitutional to recover for such deprivation in the absence of a demand or request for its exercise."

In addition we note that Applebaum repeatedly testified directly or strongly implied that generally Republic's pictures were not of the type which he desired to exhibit in his theatre. While he did make the statement that he didn't pursue his desire for "top quality Grade A" pictures from Republic because of his conviction that he couldn't get them, we think his testimony on the subject shows rather clearly that what he sought from Republic was the privilege of selecting those pictures he desired to the exclusion of other exhibitors. Failing this, to which the law gave him no right, he apparently made no serious efforts to obtain any films from Republic.

 Consequently, we conclude that there is no substantial evidence in the record from which it can be inferred that Republic conspired with anyone to refuse licenses to appellees. The trial judge should have directed a verdict for Republic.

B. As to all other appellants:

We have treated Republic separately for the reason that the evidence clearly shows its conduct toward appellees was completely different from that of the other appellants, and its only reason for refusing to license its films to appellees was its prior contract with Paramount Gulf.

We are constrained to comment that the evidence of conspiracy on the part of all other appellants is weak and that we are impressed by appellants' argument that appellees' venture was foredoomed to failure because of its financial structure, location, and the method of operation. Yet, we are of the opinion that the record as a whole contains sufficient evidence of "conscious parallelism" and other activities on the part of the distributors in their relations with Paramount Gulf and with appellees to warrant submission to the jury. Since we have concluded that a new trial is necessary, we deem it unnecessary to comment in detail upon that evidence.

Accordingly, for the reasons assigned, the judgment appealed from is reversed and the matter is remanded with instructions to enter judgment in favor of Republic, and a new trial is granted as to all other appellants.

Reversed and remanded.